**Debra MANN, Plaintiff,**

v.

**OLSTEN CERTIFIED HEALTHCARE CORP., d/b/a Olsten Health Services, and Debbie Northcutt, individually and in her professional capacity, separately and severally, Defendants.**

Civil Action No. 98–T–776–N.

United States District Court,
M.D. Alabama,
Northern Division.

May 18, 1999.

Barry J. Armstrong, Long, Aldridge & Norman, Atlanta, GA, pro se.

Phillip A. Bradley, Long, Aldridge & Norman, Atlanta, GA, pro se.

Richard H. Gill, Copeland, Franco, Screws & Gill, P.A., Montgomery, pro se.

K. David Sawyer, Birmingham, pro se.

George W. Walker, III, Copeland, Franco, Screws & Gill, P.A., Montgomery, pro se.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Debra Mann brings this lawsuit alleging that she was terminated in retaliation for calling attention to her employer's practice of submitting fraudulent or incorrect bills to Medicare. Mann names two defendants: her former employer, Olsten Health Certified Healthcare Corporation, doing business as Olsten Health Services; and her former supervisor at Olsten Health, Debbie Northcutt. She brings a federal claim under the whistleblower-protection provision of the False Claims Act of 1986 ("FCA"), 31 U.S.C.A. § 3730(h), and state-law claims for intentional infliction of emotional distress and invasion of privacy. Although she does not indicate a basis for jurisdiction, the court assumes that Mann is proceeding under 28 U.S.C.A. § 1331 (federal-question) and 31 U.S.C.A. § 3730(h)(FCA) as to the federal claim and 28 U.S.C.A. § 1367 (supplemental) as to the state-law claims.

This lawsuit is now before the court on the defendants' motion for summary judgment. For reasons to follow, the motion will be granted as to the federal claim, and the state-law claims will be dismissed without prejudice.

## I. SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also*

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the non-movant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or non-movant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL SUMMARY

The facts, as garnered from the affidavits, deposition testimony, and other evidence submitted by the parties but viewed in the light most favorable to the plaintiff, are as follows. Olsten Health provides home health-care services, which are paid for by a variety of sources including Medicare, Medicaid, private insurance, and individual patients.[1] Mann began working for Olsten Health as a registered nurse on February 12, 1996, and served as the director of clinical management at its Montgomery, Alabama, office from August 5, 1996, until her termination on April 8, 1998.[2] As clinical-management director, Mann was responsible for supervising and training caregivers in patient care and for ensuring compliance with applicable statutes, regulations, and rules.[3] It was also part of Mann's job responsibilities to investigate complaints that the nurses did not provide proper services and to point out errors in billing when she found them.[4] Mann's supervisor was Northcutt, the branch director of the Montgomery office.[5] Northcutt's responsibilities included hiring, supervising, and discharging employees in that office.[6]

The events leading to Mann's termination are as follows:

*March 1997:* In early March 1997, a patient's relative called Olsten Health's Montgomery office to request that someone come to the patient's home to explain how to use a medical device.[7] Mary Grooms, a caregiver employed by Olsten Health, claimed that she visited the patient in late February 1997 and documented teaching her how to use the device and testing her with the device. Upon learning of the call, Northcutt asked Grooms whether she had made the visit but undertook no further investigation. Mann returned to the office the week after the complaint was received, and, when she learned of the call, sent another employee, Cindy Pursley, to interview the patient.[8] Pursley determined that Grooms had not made the visit. Mann also found that the test results documented in Grooms's records did not match with the reading stored on the medical device and that the patient's signature in Grooms's records did not match the signature on file. Mann found additional suspicious and missing signatures in Grooms's records of other patient visits, and brought them to Northcutt's attention.[9]

---

1. Defendants' brief in support of motion for summary judgment, filed November 24, 1998, attachment (declaration of Debbie Northcutt) (hereafter "First Northcutt declaration") at ¶ 3.

2. *Id.* at ¶¶ 4, 7.

3. *Id.* at ¶ 4 and exhibit A thereto (job description for director of clinical management).

4. Plaintiff's exhibits in support of plaintiff's opposition to defendants' motion for summary judgment, filed December 21, 1998, deposition of Debra Mann (hereafter "First Mann deposition") at pp. 44, 59.

5. First Northcutt declaration at ¶¶ 1, 4.

6. *Id.* at ¶¶ 1, 4, 6.

7. Plaintiff's supplemental exhibits in support of plaintiff's opposition to defendants' motion for summary judgment (hereafter "Plaintiff's supplemental exhibits"), filed March 18, 1999, exhibit 12 (documents regarding termination of Mary Grooms), May 2, 1997, letter from Debbie Northcutt to Judi Crume, Alabama Board of Nursing.

8. First Mann deposition at p. 56.

9. *Id.* at p. 57.

Shortly after, Mann contacted Olsten Health's in-house legal department and reported the fraudulent and missing signatures in Grooms's notes.[10] Mann does not recall whose idea it was for her to contact the legal department.[11] The legal department recommended investigating each of the possibly fraudulent visits and interviewing the patients' families.[12] When Mann relayed the legal department's advice, Northcutt called the legal department herself and took Mann off of the case.[13]

Grooms was terminated effective March 21, 1997, by mutual decision of Mann, Northcutt, the legal department, and other Olsten Health executives.[14] Northcutt canceled the bill for the confirmed fraudulent visit but she did not investigate or cancel the bills related to the other suspicious visits.[15] Northcutt also informed the legal department that she did not want to conduct any further investigation because it would harm Olsten Health's reputation and could be fruitless anyway because the patients would not remember whether Grooms had made any particular visit.[16]

*June 1997:* In June 1997, when a patient named B.C. became eligible for Medicare, Olsten Health started billing Medicare for services for B.C. that were not Medicare eligible.[17] Mann told Northcutt that she could not bill Medicare for these services, but Northcutt disagreed.[18] According to Mann, Northcutt seemed to have a different understanding of what was allowable under Medicare than Mann did.[19] Mann called Olsten Health's designated "Central Support" office, a resource on Medicare regulations, for assistance and asked Sandy Wheeler, Olsten Health's designated support person, to call Northcutt about B.C.'s billing.[20] According to Mann, Northcutt said that Sandy Wheeler "didn't know anything" and "that [they] would just try to keep [B.C.] on Medicare for as long as [they] could."[21] The dispute was never resolved.

*April 1998:* Northcutt informed Mann that her position had been eliminated.[22] Northcutt also informed Mann that all clinical-management-director positions had been eliminated, but this was not true.[23]

The defendants contend that Mann was laid off because Olsten Health's Montgomery office needed to cut expenses. According to Northcutt, because of changes to Medicare rules and increased competition from managed-care and hospital-based home-health agencies, Olsten Health's

10. *Id.* at pp. 57, 64.

11. *Id.* at pp. 64–65.

12. *Id.*

13. *Id.* at p. 67.

14. *Id.* at pp. 68–69; Plaintiff's supplemental exhibits, exhibit 12 (documents regarding termination of Mary Grooms), March 26, 1997, letter from Debbie Northcutt to Alabama Board of Nursing.

15. First Mann deposition at p. 70.

16. Mann may have contacted the legal department about Northcutt's decision not to investigate each suspicious signature, although Mann's testimony is ambiguous and contradictory. *Id.* at p. 64. Specifically, Mann testified that she contacted the legal department about "the signatures that were definitely fraudulent or not there and the procedure that was broken by their own corporate standards." *Id.* According to her, "They recommended that we investigate each of those and go out and interview the families. Ms. Northcutt thought that was not to the best interest." *Id.* However, Mann also testified that she never again raised the issue of Grooms's fraudulent billings with anyone at Olsten Health after Northcutt took over the case. Plaintiff's supplemental exhibits, exhibit 13 (deposition of Debra Mann) (hereafter "Second Mann deposition") at p. 326.

17. First Mann deposition at pp. 46–47, 50–51.

18. *Id.* at p. 50.

19. *Id.* at p. 52.

20. *Id.* at p. 207.

21. *Id.* at p. 52. It is unclear whether Northcutt said this before or after Mann asked Wheeler to call her.

22. *Id.* at p. 118.

23. *Id.* at pp. 89–90, 118.

Montgomery office eliminated numerous administrative positions between 1994 and 1998,[24] reducing the number of administrative full-time positions at Olsten Health's Montgomery office from a high of approximately 33 to a low of seven.[25] In February 1998, Olsten Health began a nationwide effort to reduce costs further and required each office to develop a "Profit Improvement Action Plan" to reduce operating expenses significantly.[26] The majority of the operating expenses in the Montgomery office were salaries.[27] In response to the cost-reduction directive, Northcutt prepared a plan for the Montgomery office indicating that she had eliminated five administrative staff positions in the previous six months and four in the current month, and that she planned to eliminate two more.[28] In March 1998, she reported the elimination of six full-time caregivers and the planned elimination in April 1998 of Mann's position, the records clerk position, and the customer-support-assistant position.[29] In May 1998, Northcutt was directed to decrease her operating budget further, and thereafter she eliminated three more administrative positions.[30]

Northcutt contends that Mann's position was chosen for elimination because at least one other Olsten Health office had eliminated the clinical-management-director position held by Mann without major disruptions.[31] Prior to eliminating Mann's position, Northcutt conferred with a number of Olsten Health executives who, she claims, agreed with her assessment of the feasibility of eliminating the director-of-clinical-management position.[32]

According to Northcutt, Mann never indicated that she believed the Montgomery office had committed fraud.[33] Mann never told anyone at Olsten Health that she was going to, nor did she in fact, file, an FCA action or report her suspicions to the government.[34] Indeed, Mann was unaware of the FCA until after her termination.

### III. THE FCA

The FCA is "the Government's primary litigative tool for combatting fraud." S.Rep. No. 345, at 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. The FCA provides two vehicles for combatting fraud: a cause of action by which the government can sue those who defraud it, *see* 31 U.S.C.A. § 3730(a); and a cause of action, called a qui-tam action, by which a private individual can bring suit against a person or entity who is defrauding the government, *see* § 3730(b).

In addition, the FCA provides protection for "whistleblowers." Section 3730(h) of Title 31 of the United States Code provides:

"Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole."

24. Defendants' reply brief in support of motion for summary judgment, filed January 5, 1999, attachment (second declaration of Debbie Northcutt) (hereafter "Second Northcutt declaration") at ¶ 2.

25. *Id.* The office had ten employees as of November 1998. First Northcutt declaration at ¶ 1.

26. Second Northcutt declaration at ¶ 2.

27. *Id.*

28. *Id.*

29. *Id.* and exhibit D thereto.

30. *Id.* and exhibit E thereto.

31. First Northcutt declaration at ¶ 6.

32. *Id.*

33. *Id.* at ¶ 11.

34. First Mann deposition at pp. 208, 212–13.

Mann contends that she was discriminated against and terminated in retaliation for activities protected under this provision.

■] Courts require that a plaintiff seeking relief under § 3730(h) prove that she engaged in protected conduct and that the defendant retaliated against her because of that protected conduct. *See, e.g., Eberhardt v. Integrated Design & Constr., Inc.,* 167 F.3d 861, 866 (4th Cir.1999); *United States ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 736 (D.C.Cir.1998); *United States ex rel. McKenzie v. Bell-South Telecomm., Inc.,* 123 F.3d 935 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998). As will be explained, the court finds that Mann has established that her conduct was protected, at least to an extent sufficient to survive summary judgment. However, because she cannot establish a causal connection between the protected conduct and the adverse actions she suffered, summary judgment on this claim will be granted.

### A. Protected Conduct

Section 3730(h) protects a plaintiff's conduct "in furtherance of" an "action" under the FCA. A plain reading of the statute suggests that, to be protected, the plaintiff's conduct must be, at least, incident to an actual "lawsuit" filed or to be filed under the FCA. The type of "action" toward which the conduct must be directed is an "action filed or to be filed" by the federal government pursuant to § 3730(a), or a qui-tam "action filed or to filed" by the plaintiff or someone else pursuant to § 3730(b). In addition, the type of conduct protected is limited to that that would fall within the breadth of that outlined by the examples given in § 3730(h), that is, "investigation for" such a lawsuit filed or to be filed, "initiation of" such a lawsuit filed or to be filed, "testimony for" such a lawsuit filed or to be filed, and "assistance in" such a lawsuit filed or to be filed. 31 U.S.C.A. § 3730(h).

However, courts have rejected such a narrow reading of the statute. Instead, they have broadly interpreted the statute to provide protection in cases in which the plaintiff did not even know of the FCA or that her conduct was protected, as long as FCA litigation was a "distinct possibility" when the plaintiff acted. *Childree v. UAP/GA AG CHEM., Inc.,* 92 F.3d 1140, 1146 (11th Cir.1996), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 216 (1997); *Neal v. Honeywell, Inc.,* 33 F.3d 860, 864 (7th Cir.1994); *see also Yesudian,* 153 F.3d at 740 (to be protected, plaintiff need not have known of FCA as long as "plaintiff [was] investigating matters that 'reasonably could lead' to a viable FCA suit"); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1269 (9th Cir.1996) ("plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action"), *cert. denied,* 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997).

In looking at the case law, it is difficult to define the phrase "distinct possibility." The case law resolves few questions and raises more: A distinct possibility of what? In whose eyes? At what time? And how "distinct," or presumably non-attenuated, must the "possibility" be? Probable? Foreseeable? Or something less likely?

One case in which litigation would be a "distinct possibility" is clear: where the plaintiff knew of the FCA and told her employer that she was contemplating filing an FCA action or reporting fraud to the government. However, where the plaintiff did not even know about the FCA and therefore did not tell her employer that she was contemplating legal action, the correct application of the "distinct possibility" test is much more difficult, if not completely elusive. Indeed, the difficulty of applying, and the resulting inconsistency of, the amorphous "distinct possibility" concept is illustrated by the Eleventh Circuit's application of it in *Childree.* There, on the one hand, the appellate court broadly held that a plaintiff need not even know of the FCA in order to invoke its protections as long as litigation was a distinct possibility when she acted, 92 F.3d at 1146,

and then, on the other hand, the court specifically concluded that "filing a § 3730(h) qui tam action ... was never a distinct possibility" because the plaintiff "concedes she never even considered it." *Id.*

■ Nevertheless, a limiting definition of "distinct possibility" must be found if the factfinder, in applying the FCA, is to reach its decision in a reasoned and non-arbitrary fashion. This court believes that this limiting definition can be found by looking to the purpose of the FCA and its whistleblower-protection provision. Congress enacted the FCA in an effort to combat fraud against the government, S.Rep. No. 345, at 1, *reprinted in* 1986 U.S.C.C.A.N. at 5266, and enacted the FCA's whistleblower-protection provision "to halt companies and individuals from using the threat of economic retaliation to silence 'whistleblowers', as well as assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." S.Rep. No. 345 at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5299. The focus of the whistleblower-protection provision is on helping to assure that the motivation behind any action an employer might take against its employees is not retaliatory. The focus, in turn, of the protected-conduct inquiry—in particular, in the absence of evidence that the employee even knew about the FCA and in the absence of evidence that the employer actually contemplated retaliatory action against the employee—must be on the following: Whether the employee engaged in conduct from which a factfinder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud. For, without this circumstance, there would be no basis to conclude that the employer harbored the prohibited motivation. Therefore, litigation would have been a "distinct possibility" only if the evidence reasonably supports such fear; if the evidence does not support this fear, litigation would not have been a distinct possibility.

Under this approach, the court will look for evidence that the plaintiff, either by words or actions, communicated to the employer that she believed that the employer had engaged in illegal or fraudulent conduct involving submission of claims for payment to the government. Such a showing could be made, for example, by evidence that the plaintiff characterized the employer's conduct as illegal or fraudulent or recommended that legal counsel become involved. *Eberhardt,* 167 F.3d 861, 868–69. Accordingly, contrary to the arguments of the defendants, whether plaintiff's actions fit within such neat categories as "advocating for regulatory compliance," or "regular job responsibilities" will not be dispositive. *But cf. Hopper,* 91 F.3d at 1269 (plaintiff could not prevail on § 3730(h) claim because she investigated mere "regulatory noncompliance"); *Luckey v. Baxter Healthcare Corp.,* 2 F.Supp.2d 1034, 1051 (N.D.Ill.1998) (same). Instead, the determinative issue simply will be whether the employer could have, based upon a reasonable interpretation of the employee's conduct, feared that the employee was contemplating taking legal action under the FCA or reporting fraud to the government. This approach generally accords with that taken by a number of other courts. *See Eberhardt,* 167 F.3d at 867–869; *Yesudian,* 153 F.3d at 741–45 (D.C.Cir.); *McKenzie,* 123 F.3d at 944 (6th Cir.); *Neal,* 33 F.3d at 863–865 (7th Cir.).

In the instant case, it is undisputed that Mann was unaware of the FCA while employed at Olsten Health and did not tell anyone at Olsten Health that she intended to report fraud to the government. Thus, the court must determine whether Mann's conduct could have led the defendants reasonably to fear that she was contemplating bringing a qui-tam action or reporting fraud to the government. Mann contends that she engaged in three different types of possibly protected conduct: (1) investigating and reporting the Grooms case to the legal department; (2) trying to correct billing errors in the B.C. case; and (3)

regularly bringing billing errors to the attention of Olsten Health staff.

 Whether Mann's conduct in the Grooms episode could have reasonably led the defendants to fear that Mann was contemplating legal action is a close question. By reporting Grooms's conduct to the legal department, even if at Northcutt's behest, Mann communicated that she was aware that the conduct might be illegal. Mann also participated in the decision to fire Grooms, which also indicated her awareness of illegality. Additional facts further complicate the picture. Despite the advice of the legal department, Northcutt chose not to investigate the suspicious and missing signatures that Mann uncovered, and allowed the related visits to be billed. Thus, the defendants could have reasonably feared that Mann would undertake legal action to rectify their failure to investigate these suspicious circumstances. It is unclear whether Mann gave any indication that she thought that Northcutt's failure to investigate was legally problematic because her testimony is self-contradictory. Mann testified both that, after Northcutt took the Grooms case from her, she never said anything to anyone at Olsten Health about the case again, and that she contacted the legal department about Northcutt's failure to follow its recommendation to investigate every suspicious signature in Grooms's files. If Mann did contact the legal department for that reason and the defendants were aware of it, the defendants clearly could have reasonably feared that she was contemplating a qui-tam suit or reporting fraud to the government. However, the court need not resolve whether Mann complained to the legal department about Northcutt's failure to investigate. Generally speaking, when an employee informs her employer about the discovery of suspected fraud and the employer takes no action to correct it, the

employer has reason to fear that the employee will file a qui-tam action or report suspected fraud to the government, unless the employee by words or actions affirmatively indicates otherwise. Mann reported suspected fraud and Northcutt took no action to see that it was not billed to the government. Therefore, the defendants reasonably could have feared that Mann was contemplating legal action. Thus, the court holds that Mann engaged in protected conduct when she investigated and reported Grooms's suspected fraudulent activity.

Mann's efforts to stop Northcutt from billing Medicare for certain services for B.C. also could have led the defendants reasonably to believe that she was contemplating filing a qui-tam action or reporting fraud to the government. The record reveals that Mann disagreed with Northcutt about whether certain services should be billed to Medicare or to B.C.'s private insurer and told Northcutt that she should not bill Medicare for those services. She did not tell Northcutt that what she was doing was illegal or fraudulent. However, it would be unrealistic to expect an employee to accuse a supervisor of committing fraud when that supervisor has the power to demote or terminate her or to influence her advancement in the company. *See Mikes v. Strauss*, 889 F.Supp. 746, 753 (S.D.N.Y.1995); [35] *cf. Yesudian*, 153 F.3d at 743. While, on this occasion, Mann did not go as far as contacting the legal department, she did contact Sandy Wheeler, Olsten Health's designated Medicare-regulations support person, to ask for advice about how to handle Northcutt, and she had Wheeler contact Northcutt to explain the pertinent Medicare regulations to her. Thus, Mann's conduct made clear that she believed that Northcutt was improperly billing Medicare and that she was serious about correcting it. The defendants could

---

**35.** The *Mikes* court noted: "To insist upon an express or even an implied threat of [FCA] action would impose a requirement which is wholly unrealistic in an employment context. Despite the protection afforded by § 3730(h)—of which most employees are doubtless unaware—those who tell their employers they are preparing to sue them on behalf of a defrauded government can scarcely expect a long and happy tenure." 889 F.Supp. at 753.

have reasonably believed, based on this conduct, that Mann was ·contemplating a qui-tam suit or reporting fraud to the government.

■ Mann's routine efforts to correct mistakes in billing, in contrast, could not have put the defendants in fear that she was contemplating legal action or reporting fraud. The evidence before the court is that Mann pointed out a variety of billing errors, which she noticed in the course of her regular duties, by asking the appropriate person to cancel the bill for the service.[36] Mann took no further action after notifying the appropriate person of the error. Although she testified that she occasionally noticed that something had been billed that she earlier had recommended not be billed, she also testified that she did not investigate why the bills had not been canceled or try to have them canceled. Nor did she refer to these errors as illegal or fraudulent, report them to the legal department, or call attention to them in any way. In short, she did nothing that could have led the defendants to believe that she was contemplating filing a qui-tam suit or initiating a government investigation into fraud. Furthermore, Mann has presented no specific evidence that these errors were in bills that would have been submitted to Medicare or. any other government program. If the bills' were not submitted to the government, however, the defendants could not have reasonably feared FCA action. Thus, Mann's efforts to correct inaccuracies in bills do not constitute protected conduct.

### B. Causal Connection

To prevail on a FCA claim, a plaintiff must also demonstrate a causal connection between her protected conduct and the allegedly retaliatory actions she suffered. Section 3730(h) "provides relief only if the whistleblower can show by a preponderance of the evidence that the employer's retaliatory actions resulted 'because' of the whistleblower's participation in a protected activity." S. Rep. 99–345, at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5299. A plaintiff seeking recovery under § 3730(h), as under other Federal whistleblower statutes, "must show that retaliation was motivated, at least in part, by the employee's engaging in protected activity." *Id.* Once that showing has been made, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity. *Id.* Thus, to survive summary judgment, Mann must establish the existence of a genuine issue of fact as to whether the negative treatment she suffered was motivated at least in part by retaliation for her protected conduct. She has not done so.

■ To prove a causal connection, a plaintiff may either present direct evidence of retaliatory intent or raise, by indirect evidence, an inference of retaliation. *See Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1060–1061 (11th Cir.1994); *Howard v. BP Oil Co.,* Inc., 32 F.3d 520, 524 n. 2 (11th Cir.1994). "Direct evidence is evidence that establishes the existence of [retaliatory] intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted). Mann has presented no direct evidence of retaliatory intent.

■ When a plaintiff seeks to prove her case with indirect evidence, as Mann does here, the plaintiff has the initial burden of establishing a prima-facie case.[37]

---

**36.** The appropriate person sometimes was Northcutt but usually was one of Northcutt's subordinates charged with entering bills into the computer system. Therefore, it is unclear whether Northcutt, who Mann contends was the driving force behind her termination, was aware of all of Mann's efforts to correct billing errors.

**37.** Courts use the Title–VII burden-shifting method of proof in analyzing retaliation claims under federal whistleblower statutes. *See, e.g., Bechtel Const. Co. v. Secretary of Labor,* 50 F.3d 926, 934 (11th Cir.1995) (case under whistleblower-protection provision of Energy Reorganization Act of 1974, § 210(a), as amended, 42 U.S.C.A. § 5851(a)); *Simas v. First Citizens' Federal Credit Union,* 170 F.3d 37, 43–44 (1st Cir.1999) (case under whistle-

To prove a prima-facie case of retaliation, courts require that the plaintiff prove that (1) the employer is covered by the act at issue, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action. *See Bechtel Const. Co. v. Secretary of Labor,* 50 F.3d 926, 934 (11th Cir.1995) (case under whistleblower-protection provision of Energy Reorganization Act of 1974, § 210(a), as amended, 42 U.S.C.A. § 5851(a)). The showing necessary to demonstrate the causal-link part of the prima-facie case is not onerous; the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir.1997). "To do so, [t]he plaintiff must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff." *Id.*

■■■ If established, the prima-facie case raises a presumption that the employer is liable to the employee. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, known as the *McDonnell Douglas* approach, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer took unlawful actions against the employee. The employer can meet this burden of production by articulating a legitimate, nonretaliatory reason for the employment decision, a reason which is clear, reasonably specific, and worthy of credence. The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered rea-

son. *See Burdine,* 450 U.S. at 253–55, 101 S.Ct. at 1093–94. Once the employer satisfies this burden of production, the focus shifts to the employee's ultimate burden of proving by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for retaliation. The employee may meet this burden by persuading the factfinder either directly that a retaliatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. *See id.* at 256, 101 S.Ct. at 1095.

Mann has presented a prima-facie case of retaliation. It is undisputed that Olsten Health is subject to the FCA. As discussed earlier, Mann engaged in conduct protected under § 3730(h) of which the defendants were aware, and she was terminated.

■■■ The defendants offer a nonretaliatory explanation for Mann's termination: that she was laid off in an effort to cut costs. They have submitted abundant evidence that Olsten Health's revenues were declining, that Olsten Health ordered Northcutt to cut costs, and that Mann, along with many other administrative employees in the Montgomery office, were laid off as a result. To survive summary judgment, therefore, Mann must offer evidence based upon which a jury reasonably could conclude that the defendants' proffered justification for terminating her was a pretext for retaliation.

Mann offers no evidence that the defendants' proffered justification for terminating her was not reasonable, sound, and worthy of belief. She does not dispute that Olsten Health was suffering declining revenues or that the company laid off many administrative employees immediately before and after she was terminated. Indeed, she admits that she was aware of declining revenues and layoffs at the office before her termination. Nor does she of-

blower provisions of the Federal Credit Union Act, 12 U.S.C.A. § 1790b(a)) and cases cited therein.

fer any evidence that it did not make sense to eliminate her position or that the office could not function without a director of clinical management.

Mann does note that, before her termination, Northcutt reassured her that her position would not be eliminated and that Northcutt's position would be eliminated before Mann's was. However, Northcutt's statement does not create a genuine issue of material fact as to whether Mann was terminated because of Olsten Health's financial difficulties. On the contrary, Mann's desire for reassurance about the security of her position supports the defendants' version of events. Furthermore, if Northcutt wanted to fire Mann for interfering with her allegedly fraudulent activities, she likely would not have reassured Mann that her position was not threatened. It would have made more sense for Northcutt to give Mann the impression that she was in danger of being laid off for financial reasons, in order to cover her true retaliatory reasons for terminating Mann.

Mann also offers two documents to show that Mann's director-of-clinical-management position continued to exist after she left: an undated organizational chart of Olsten Health's Montgomery office indicating the existence of a director-of-clinical-management position, and a form, dated after Mann's termination, on which Cindy Pursley, who served as a manager of clinical practice under Mann, allegedly initialed a space designated for the director of clinical management. Neither document is sufficient to establish a genuine issue of material fact as to the truth of the defendants' proffered reason for terminating Mann. Because Mann has produced no evidence of when the organizational chart was created, the chart proves nothing about whether Olsten Health has filled the director - of - clinical-management position since Mann's termination. Pursley's initials, in contrast, do suggest that she might have been serving as director of clinical management after Mann's termination. However, Mann has submitted no other evidence to suggest that Pursley

served as director of clinical management after Mann's termination. All other evidence, including Pursley's own deposition testimony, indicates that Pursley continued to serve as manager of clinical practice after Mann's termination. To create a genuine issue of material fact sufficient to survive summary judgment, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party". *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). A reasonable jury could not disbelieve the defendants' evidence based on the presence of Pursley's initials on one form. Mann has not undermined the defendants' proffered justification for terminating her.

Mann can prevail nevertheless, if she can show that, regardless of the truth of the reason given by the defendants, they were actually motivated in part by retaliation when they terminated her. Mann seeks to demonstrate retaliatory motivation by several methods. First, she tries to show that after she engaged in protected conduct, Northcutt began a pattern of discriminatory conduct against her which ended in her termination. Second, she attempts to show that her protected conduct interfered with Northcutt's efforts to obtain a bonus. Third, she offers evidence that Northcutt lied when she terminated her. None of these efforts succeeds in establishing a causal relationship between Mann's protected conduct and her termination.

■ Mann has presented insufficient evidence to establish that Northcutt engaged in a pattern of retaliatory discrimination. Mann contends that after she engaged in protected conduct, Northcutt acted angrily towards her. However, the only evidence she offers to support this claim is a few lines of her own deposition testimony: first, her statements that, after she "started questioning the billing," "[i]t was like [she and Northcutt] were just hitting heads all the time," and Mann

"started getting a hard time;" [38] and, second, her statement that, after Wheeler called Northcutt, Northcutt's "fury and [ ] rage began." [39] However, she provides no detail as to what Northcutt said or did to express her anger, the circumstances of any specific occasion on which she acted angrily, on how many occasions she acted angrily, and how long her anger lasted. She also offers no evidence that Northcutt's anger was directed at her exclusively or even predominantly. Without such supporting detail, Mann's perception that Northcutt was angry with her does not prove that Northcutt engaged in a pattern of retaliatory conduct towards her.

Mann also contends that Northcutt restricted Mann's computer access in retaliation for her protected conduct. Mann testified that there were two computers in Olsten Health's Montgomery office—one at Northcutt's office and one at the front desk—and that when she first started working at Olsten Health, Northcutt allowed her to use the computer in Northcutt's office. Shortly after the Grooms episode, Mann "was denied access to" Northcutt's computer.[40] Mann found using the front-desk computer uncomfortable, so she asked Northcutt if she could get her own computer.[41] Northcutt told her to use the front-desk computer or "buy one like the clinical manager in Birmingham did." [42] Mann offers no evidence that she was singled out for negative treatment. However, without such evidence, Northcutt's decision to keep her own computer for herself does not prove that she was retaliating against Mann.

As further evidence of discrimination, Mann contends that Northcutt and Paula Shoemaker, an Olsten Health excutive, had many conferences and meetings in which Mann believed she should have been included.[43] Mann provides no evidence indicating when these alleged meetings occurred or how she knew what the meetings were about. Nor does she provide any evidence that prior to her protected conduct she was included in all meetings. Mann's feeling that she should have been included in these meetings, without evidence demonstrating the objective validity of her feelings, is not sufficient to survive summary judgment.

Mann also views as harassment, and evidence of retaliatory motive, Northcutt and Shoemaker's assignment of significant new responsibilities to Mann in September 1997.[44] The evidence reveals that the staff was complaining about having too much work because of the layoffs of administrative staff and that Shoemaker and Northcutt redistributed some of the work to Mann to alleviate the complaints. Mann perceived the assignment of additional responsibility as Northcutt's effort to "invent[ ] a new job to take up [Mann's] time so [she] wouldn't have time to get into those things." [45] However, Mann offers no evidence to back up her conclusion or to dispute the reasons given by the defendants. Given that Olsten Health's Montgomery office had laid off much of its administrative staff when Mann was assigned additional tasks, it is hardly surprising that Mann would have been asked to take on extra responsibility. Mann's unsupported allegation that the assignment was designed to distract her from uncovering fraud is insufficient to establish a genuine issue of material fact. *See Holifield v. Reno*, 115 F.3d at 1564 n. 6 (conclusory allegations, without more, insufficient to withstand summary judgment).

38. *Id.* at p. 188.

39. First Mann deposition at p. 206.

40. Second Mann deposition at p. 294.

41. *Id.*

42. *Id.*

43. *Id.* at pp. 112–13.

44. *Id.* at p. 134; *see also* Second Mann deposition at p. 293 and Plaintiff's supplemental exhibits, exhibit 13 (deposition of Debra Mann and exhibits thereto), September 18, 1997, memorandum to Debbie Northcutt from Debra Jean Mann.

45. First Mann deposition at p. 187.

Mann also offers as evidence of harassment and retaliatory motive that Northcutt gave her formal counseling sessions in November 1997 and February 1998.[46] Both counseling sessions were for problems with the way in which Mann communicated with caregivers who allegedly complained to Northcutt that Mann gave them conflicting instructions.[47] Northcutt also counseled Mann for not doing enough work and for doing too much administrative and not enough clinical work. Mann disputed the fairness of Northcutt's decision to counsel her on the sole basis of complaints from caregivers, without any additional investigation, and disagreed that her performance was deficient.[48]

The counseling sessions do not support Mann's argument that her termination was the last step in a pattern of retaliatory conduct. First, Mann has not undermined the proffered reasons for the counseling sessions. To dispute the validity of the counseling sessions, Mann notes that she had never received a counseling before. Since Mann had been director of clinical management for little more than a year before her first counseling session, Northcutt's failure to counsel her previously does not cast doubt on the validity of the criticism.[49] Mann's only other evidence to attack the validity of the counseling sessions is her own opinion that her behavior was professional and that counseling was not warranted. However, a plaintiff's unsupported opinion that criticism was not warranted does not create a genuine issue of material fact as to the validity of a reprimand. *See Holifield,* 115 F.3d at 1565 ("Thus, where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence."); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997) ("a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer"), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

Furthermore, there was a lapse of almost five months between Mann's efforts in the B.C. case and the first counseling session. This lapse of time weakens any inference of retaliation. Most importantly, the counseling sessions are not probative of a causal connection between Mann's protected conduct and her termination because Northcutt did not rely on the counseling sessions in terminating her.[50] Instead of citing the criticisms raised in the counseling sessions as a justification, Northcutt expressed regret about having to terminate Mann because she had been making progress in following Northcutt's directives.[51] Because Northcutt did not rely on the counseling sessions in terminating Mann, the counseling sessions do not prove a causal connection between Mann's protected conduct and her termination.[52]

**46.** *Id.* at p. 134; Plaintiff's supplemental exhibits, exhibit 13 (deposition of Debra Mann and exhibits thereto), record of counseling dated February 13, 1998.

**47.** *Id.*

**48.** *Id.,* and February 17, 1998 note from Mann in addendum to record of counseling dated February 13, 1998.

**49.** Had Mann gone for five years without criticism, Northcutt's counseling sessions would be more significant.

**50.** *Id.* at pp. 119–20.

**51.** *Id.* at pp. 118–19.

**52.** Mann points out that, as part of the second counseling session, Northcutt asked her to sign an "action plan," which Mann refused to do. Shortly afterward, Mann claims that she overheard Northcutt telling someone on the telephone that "it didn't work" and that Mann wouldn't or didn't "sign the action plan." Based on this evidence, Mann seeks to prove that the counseling sessions were part of a plan by Northcutt to develop a pretext for terminating her, that the plan did not work because she would not sign the "action plan," and that, as a result, Northcutt

Mann also attempts to show a causal connection by introducing evidence of Northcutt's motive for retaliation: Mann speculates that her efforts to correct billing errors interfered with Northcutt's effort to obtain a bonus.[53] The record reveals that, in January 1997, Olsten Health instituted an incentive bonus program the target of which was to increase Medicare business.[54] By the terms of this program, all non-caregiver employees would receive a bonus of $5.00 per visit for every appropriately billed Medicare visit in excess of a base amount through the end of March 1997.[55] There is no evidence that this program continued after March 1997.[56] Therefore, even if Northcutt had been motivated by this program during the Grooms episode, it would not explain any of her actions after that month. In any case, Mann has presented no evidence suggesting that Northcutt was motivated by this program or that Mann's efforts could have affected Northcutt's bonus under the program. Mann's conclusory allegation that her attempts to correct billing practices "interfered with what [Northcutt and Paula Shoemaker, an Olsten Health executive] were doing because they wouldn't get their bonus" is insufficient to establish the existence of a genuine issue of material fact.[57] Olsten Health's institution of an incentive bonus program, without evidence showing that Northcutt was motivated by it, is irrelevant.

The final piece of evidence offered by Mann in support of her argument is that, when Northcutt fired Mann, she falsely told Mann that Olsten Health was eliminating all director-of-clinical-management positions. Although this evidence does suggest that Northcutt was untruthful with Mann, Northcutt's lack of truthfulness, without more, is not a sufficient basis upon which to find a causal connection between Mann's protected activity and her termination a year later.

In short, Mann has not presented evidence sufficient to establish a genuine issue of material fact as to the causal connection between her protected conduct and her termination. The evidence is almost overwhelming that the reasons given by the defendants for her termination were valid. It bears emphasizing that almost a year had passed between Mann's last involvement in the B.C. case and her termination. Although the passage of time is not determinative of a finding of causal connection, it does undermine her case. Furthermore, while Mann's activities were protected, it cannot be overlooked that it was her duty to point out billing errors and investigate complaints from clients. Mann must prove that the defendants did not want her to complete the tasks they hired her to perform. She has not done so. Thus the court will grant summary judgment for the defendants on Mann's FCA claim.[58]

had to come up with another reason for terminating her.

This theory is utterly lacking in support. Mann has offered no evidence to explain what an action plan is or to prove that Northcutt would have needed Mann to sign the action plan in order to terminate her on the basis of her work performance. Because it is based on nothing but speculation, this theory is insufficient to establish a genuine issue of material fact.

53. *Id.* at pp. 110–11.

54. Plaintiff's supplemental exhibits, exhibit 5 (documents regarding bonus program).

55. *Id.*

56. Olsten Health also instituted an incentive program in January 1998 which was based

upon a combination of winning new clients, obtaining payment in a timely manner, converting referrals into clients, and patient satisfaction. There is no indication that this program turned on the level of billing Medicare. *Id.*

57. First Mann deposition at pp. 110–11.

58. On April 12, 1999, Mann belatedly offered evidence that, in March 1999, the Olsten Health settled an FCA claim with the government involving allegations of Medicare fraud. There is no evidence, however, that the Olsten Health's Montgomery office, Northcutt, or Mann was in any way connected with that case or that Northcutt or Olsten Health was aware of any ongoing fraud investigation while Mann was employed at Olsten Health. Thus this evidence is without relevance.

### C. Punitive Damages

Because Mann cannot survive summary judgment on her FCA claim, the court need not address her contention that she is entitled to general punitive damages under § 3730(h).

## IV. STATE–LAW CLAIMS

Because the court will grant summary judgment as to Mann's sole federal claim, the court declines to exercise supplemental jurisdiction as to her state-law claims and accordingly will dismiss these claims pursuant to 28 U.S.C.A. § 1367(c)(3), albeit without prejudice to refiling the claims in state court.[59] *See L.S.T., Inc. v. Crow,* 49 F.3d 679, 685 (11th Cir.1995) (per curiam).

## V. CONCLUSION

For the reasons explained above, the court will grant summary judgment for the defendants on Mann's federal claim and will dismiss her state-law claims against the defendants without prejudice. An appropriate judgment will issue.

---

**59.** The dismissal of the state-law claims without prejudice should not work to Mann's disadvantage. Section 1367(d) provides for at least a 30–day tolling of any applicable statute of limitations so as to allow a plaintiff to refile her claims in state court. The section states:

"(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."