**Adam SMITH, a minor, by Vivian LANHAM, as legal guardian and next friend, Plaintiff,**

v.

**GREENE COUNTY SCHOOL DISTRICT, et al., Defendants.**

**No. 3:98–CV–83 DF.**

United States District Court, M.D. Georgia, Athens Division.

June 21, 2000.

**1356**

John F. Beasley, Jr., Athens, GA, for Plaintiff.

Phillip L. Hartley, Gainesville, GA, Christopher E. Parker, Atlanta, GA, for Defendants.

FITZPATRICK, District Judge.

The above styled case is presently before this Court on Defendants' motion for summary judgment (tab # 41).

## I. FACTS

At the time of the events alleged in his complaint, the plaintiff, Adam Smith, was a fifth grade student at Union Point Elementary School. Plaintiff is represented in this action by his mother, Ms. Vivian Lanham. Defendant S. Jean Goodwin was the principal of Union Point Elementary School and Defendant Darryl Rabbitt was the superintendent of the Greene County School System.[1] Ms. Sherrell Robbins and Ms. Annie Lois Grant were paraprofessionals at Union Point Elementary School.[2] Both Ms. Robbins and Ms. Grant worked with the physical education classes, taught by Ms. Lisa Brown.[3]

On Friday, March 27, 1998, Plaintiff was involved in an incident on the playground during his physical education class (Dep. of Adam Smith (tab # 46) ("Smith Dep."), pp. 27–29; Dep. of Sherrell Robbins (tab # 57) ("Robbins Dep."), pp. 12–14). The details of this incident are in dispute. Some kind of physical contact occurred between Plaintiff, who is Hispanic–American, and another boy, who is black (Smith Dep., p. 28, ll. 3–15). When Ms. Robbins, who is black, became aware of the incident, she separated the boys and directed Plaintiff to sit out of the class (Robbins Dep., pp. 12–14). Plaintiff maintains that he believed that he had been treated unfairly (Smith Dep., p. 44, ll. 22–23). Plaintiff asked Ms. Robbins is she was a racist (Smith Dep., p. 44, ll. 18; Robbins Dep., p. 15, l. 10). At first Ms. Robbins ignored the question but, when Plaintiff asked a second time, she responded that she did not know the meaning of the word (Smith Dep., p. 50, ll. 12–13; Robbins Dep., p. 16, ll. 1–9). According to Ms. Robbins, Plaintiff then said "you are a racist and a liar" (Robbins Dep., p. 15, ll. 23–25). Plaintiff contends that, after Ms. Robbins said that she did not know the meaning of the word, he asked her if he could rejoin the class to play (Smith Dep., p. 50., ll. 12–18). According to Plaintiff, Ms. Robbins told him "no, I'm a racist, remember"; Plaintiff responded by saying "you're lying, I didn't call you a racist, I asked if you were one" (Smith Dep., p. 50, ll. 18–21). Ms. Robbins then escorted Plaintiff to Defendant Goodwin's office to discuss the situation (Smith Dep., p. 51, ll. 20–22; Robbins Dep., p. 17, ll. 16–17; Dep. of S. Jean Goodwin (tab # 54) ("Goodwin Dep."), p. 79, ll. 7–8).

While in Defendant Goodwin's office, Plaintiff apologized to Ms. Robbins for his comments (Smith Dep., p. 52, ll. 10–12; Robbins Dep., p. 20, ll. 22–23; Goodwin

---

1. As of July 16, 1999, the date on which Defendants filed their statement of facts, Ms. Goodwin and Mr. Rabbitt continued to hold these positions.

2. As of March 18, 1999, the date of her deposition, Ms. Robbins continued to hold this position.

3. As of March 18, 1999, the date of her deposition, Ms. Brown continued to hold this position.

Dep., p. 80, ll. 15–22). The parties dispute the punishment that Plaintiff received. According to Plaintiff, he was told that his punishment would include losing tokens, missing a school social, and writing a mediation essay during his next physical education class time (Smith Dep., p. 53, ll. 11–16). According to Defendant Goodwin, she advised Plaintiff that, as punishment for his misconduct, he should report to her office during his physical education class (12:50 to 1:40 p.m.) the next day to write a mediation essay, describing how he could have handled the situation differently (Goodwin Dep., p. 81, ll. 16–22). When he went home after school, Plaintiff told his mother about this incident (Smith Dep., p. 55, ll. 11–12).

Plaintiff did not attend school on Monday, March 30, 1998 (Smith Dep., p. 64, ll. 19–23). Although the evidence conflicts as to whether the meeting took place on Friday, March 27, or Monday, March 30, Ms. Lanham and Plaintiff visited the school on one of these afternoons to discuss the incident and the mediation essay (Smith Dep., pp. 58–60; Dep. of Vivian Lanham (tab # 47) ("Lanham Dep."), p. 30, ll. 6–13; Goodwin Dep., p. 90, ll. 7–12). Ms. Lanham took the position that her son would not write the mediation essay (Lanham Dep., p. 34, ll. 19–20; Goodwin Dep., p. 96, ll. 13–16). When the meeting ended, Defendant Goodwin told Plaintiff to report to her office during his physical education class the next day (Goodwin Dep., p. 96, ll. 10–12). According to Plaintiff, he told his mother after this meeting that he did not feel that they "were heard because either way she [Ms. Goodwin] wins" (Smith Dep., p. 61, ll. 4–5). After Plaintiff agreed to wear it, Ms. Lanham affixed lettering on the front of a shirt which read "KIDS HAVE CIVIL RIGHTS TOO" (Smith Dep., p. 62, ll. 14–21; Lanham Dep., p. 50, ll. 5–14). On the back of the shirt, Ms. Lanham affixed lettering which read "EVEN ADULTS LIE" (Smith Dep., p. 62, l. 21; Lanham Dep., p. 50, ll. 5–14).

On Tuesday, March 31, 1998, Plaintiff wore the shirt with the lettering to school (Smith Dep., p. 66, ll. 17–24). When he arrived at the school that morning, other students asked him to explain what the shirt meant and why he was wearing the shirt (Smith Dep., p. 67, ll. 4–5, 22–24). In response to these questions, Plaintiff told the students "nothing and you wouldn't understand and something that happened Friday" (Smith Dep., p. 67, ll. 8–9). Plaintiff stated that he only wore the shirt for "[a]bout 15 minutes because of the questions. I mean it wasn't everybody crowding around me. They asked me a lot of questions about it and I was tired of people asking me questions" (Smith Dep., p. 69, ll. 15–21). Although the evidence conflicts as to whether Plaintiff put the shirt back on at any time before reporting to Defendant Goodwin's office during his physical education class that day, Plaintiff put the shirt back on when he reported to the office because he "wanted to be heard" by the principal and he wore it for the rest of the day (Smith Dep., pp. 69–71; p. 70, ll. 10–16). Plaintiff did not write the mediation essay (Smith Dep., p. 71, ll. 9–10). According to Plaintiff, Defendant Goodwin did not ask him to write the essay (Smith Dep., p. 71, ll. 11–12). Plaintiff maintains that Defendant Goodwin would not let him leave her office at the end of the period (Smith Dep., p. 71, ll. 23–25 to p. 72, ll. 1–9).

According to Plaintiff, he was asked to come into Defendant Goodwin's office while Defendant Rabbitt was in the office (Smith Dep., p. 72, ll. 16–21). Plaintiff states that Defendant Rabbitt "told me to turn around and read my shirt and when he looked at the front Ms. Goodwin said, okay, I agree with that, and then turned me around and he started laughing and he said go ahead and she gave me a write-up slip and said I was suspended for three days" (Smith Dep., p. 72, ll. 22–25 to p. 73, ll. 1–2). Defendant Goodwin denies that she made this statement (Goodwin Dep., p. 122, ll. 19–25).

Defendant Goodwin agrees that Plaintiff reported to the office during his physical education class as instructed (Goodwin Dep., p. 99, ll. 9–13). According to Defendant Goodwin, Plaintiff sat in a chair in the outer office and refused to respond when she asked him "Are you here to write the essay?" (Goodwin Dep., p. 99, ll. 15–25). Defendant Goodwin then asked if Plaintiff was going to respond to her and he shook his head back and forth without ever verbally responding (Goodwin Dep., p. 100, ll. 1–6). After telling Plaintiff that she was not going to argue with him about this, Defendant Goodwin states that she returned to her office (Goodwin Dep., p. 100, ll. 12–15). According to Defendant Goodwin, she told Plaintiff that he could leave after the bell rang and he left her office (Goodwin Dep., p. 101, ll. 11–16). Defendant Goodwin maintains that Ms. Grant brought Plaintiff back to the office a short time later, telling her that, when asked about the back of his shirt by the other students, he said "That's for Ms. Robbins" (Goodwin Dep., p. 101, ll. 18–23). Defendant Goodwin stated that Ms. Grant told her that Plaintiff was causing a disturbance (Goodwin Dep., p. 102, ll. 20–25; p. 104, ll. 10–25 to p. 105). Defendant Goodwin testified that she heard students yelling but that she did not hear the comment, "This is for Ms. Robbins" (Goodwin Dep., p. 103, ll. 17–19). According to Defendant Goodwin, the information she received indicated that the students were "in a turmoil" about the shirt (Goodwin Dep., p. 106, l. 22). Defendant Goodwin stated that she asked Plaintiff to have a seat, called Defendant Rabbitt, and asked several of the teachers to join her and Defendant Rabbitt in her office (Goodwin Dep., p. 108, ll. 6–7, 18–20).

Defendant Goodwin's secretary, Ms. Walker, testified that Plaintiff left the office at the end of the period (Dep. of Christine Camille Walker (tab #60) ("Walker Dep."), p. 45, ll. 15–17). Ms. Walker believes that Defendant Goodwin told Plaintiff that he could leave (Walker Dep., p. 45, ll. 18–25). According to Ms.

Walker, an adult brought Plaintiff into the office on the afternoon that he was suspended because "the T-shirt he was wearing was causing a disturbance between him and some other students" (Walker Dep., p. 47, ll. 19–25). Although she could not be positive, Ms. Walker thought that Ms. Grant might be the adult who brought Plaintiff into the office (Walker Dep., p. 49, ll. 17–19). Ms. Walker did not hear any disturbance herself or observe Plaintiff behaving in a surly or disruptive manner (Walker Dep., p. 48, ll. 15–17; p. 52, ll. 15–18).

Ms. Grant, a paraprofessional, testified that she overheard students during the morning going from one class to the next asking each other if they had seen Plaintiff's shirt (Dep. of Annie Lois Grant (tab #56) ("Grant Dep."), pp. 47–48). She could not remember the number of kids that she heard ask the question and denied that this was creating a lot of noise and disturbance (Grant Dep., p. 48, ll. 7–18). Ms. Grant testified that she did not take Plaintiff into the office and that, although Plaintiff told her that the phrase on the back of his shirt was for Ms. Robbins, she did not tell Defendant Goodwin that Plaintiff had said this (Grant Dep., p. 51, l. 24; p. 53, ll. 19–21; p. 54, l. 20). Ms. Grant testified that she went to Defendant Goodwin to tell her that Plaintiff had on a shirt that she did not feel good about (Grant Dep., p. 52, ll. 15–18). Defendant Goodwin described Ms. Grant as upset by the shirt (Goodwin Dep., p. 107, ll. 21–25 to p. 108, ll. 1–4) and Ms. Grant testified that the shirt was upsetting to her (Grant Dep., p. 52, l. 25 to p. 53, ll. 1–11).

Ms. Robbins testified that one or two children came up to her and told her that Plaintiff said he wore the shirt for her (Robbins Dep., p. 36, ll. 4–8). Additionally, Ms. Robbins testified that there was a commotion in the hall when the students started talking about the T-shirt (Robbins Dep., pp. 36–39). Ms. Robbins testified that she was present during a meeting of

teachers in Ms. Goodwin's office where the teachers discussed that they were offended by the shirt (Robbins Dep., pp. 41–43). Ms. Brown, the school's P.E. teacher, testified that Ms. Grant told her about the T-shirt and that the students were talking about it (Dep. of Lisa Brown (tab # 58) ("Brown Dep."), pp. 33–36). Ms. Brown stated that some of the children came up to her about the T-shirt as well (Brown Dep., p. 39, ll. 10–14). According to Ms. Brown, the students were "all clamoring, trying to figure out what's going to go on, what's happening, you know, what are the teachers going to do" (Brown Dep., p. 39, ll. 21–23). Although she could not remember who took Plaintiff to the office, she testified that either she, Ms. Grant, or Ms. Robbins did so (Brown Dep., p. 41, ll. 6–9).

Ms. Brown's testimony regarding the circumstances of Plaintiff's suspension is difficult to understand. Ms. Brown remembered being called into a meeting with Defendant Rabbitt to discuss the "disruption of [her] class" (Brown Dep., p. 44, ll. 1–5; p. 45, l. 14). In response to counsel's question about what Defendant Rabbit said at the meeting, Ms. Brown replied: "I don't know exactly, but I remember he said—he said, yes, you can suspend him or whatever. Suspend—which is the good one?" (Brown Dep., p. 44, ll. 7–9). After attempting to clarify Ms. Brown's testimony, Plaintiff's counsel asked Ms. Brown to describe her understanding of why Defendant Rabbitt told Ms. Goodwin to suspend Plaintiff (Brown Dep., p. 48, ll. 15–21). The following exchange then took place:

A. From what I remember, it's disruption, wearing that shirt, but also from other instances where she had paperwork also. But that the shirt outright called Ms. Robbins a liar and caused a disruption. But there was other paperwork there, too, where other things had happened.

Q. Uh-huh. Did Mr. Rabbitt say anything as to why he was suspending Adam?

A. I don't remember. I mean, I don't remember.

(Brown Dep., p. 48, ll. 22–25 to p. 49, ll. 1–6).

Defendant Rabbitt acknowledges that he was present at the Union Point Elementary School on the day that Plaintiff was suspended at Defendant Goodwin's request (Dep. of Darryl Rabbitt (tab # 55) ("Rabbitt Dep."), p. 48, ll. 2–11). Defendant Rabbitt testified that he was present in Defendant Goodwin's office when several paraprofessionals and teachers at the school discussed the situation and the disruption at the school (Rabbitt Dep., pp. 52–54). Defendant Rabbitt testified that, after the teachers and parapros left the office, "Ms Goodwin said that she was going to suspend the student, and I told Ms. Goodwin that I would support her on her decision and that I appreciated her letting me know that information" (Rabbitt Dep., p. 55, ll. 7–11). According to Defendant Rabbitt, he stopped and looked at the front and back of Plaintiff's shirt as he was leaving the office (Rabbitt Dep., pp. 57–58). Defendant Rabbitt does not recall whether Plaintiff said anything to him or if he said anything to Defendant Goodwin after looking at the shirt (Rabbitt Dep., pp. 58–59). After looking at the shirt, Defendant Rabbitt said that he left the building (Rabbitt Dep., p. 59, ll. 8–10).

Defendant Goodwin testified that, after the teachers left the office, the following exchange took place: "I said to him [Rabbitt] I felt like it was a suspendible offense, but that it was going to be very difficult because Ms. Smith was very difficult to deal with. He said, 'What would you do with any other student?' I said, 'I would suspend him.' And he said, 'Then do that.'" (Goodwin Dep., p. 114, ll. 19–25). Defendant Goodwin stated that she believed that she did ask Defendant Rabbitt to look at Plaintiff's shirt (Goodwin Dep., p. 122, ll. 1–3). Additionally, Defendant Goodwin stated that Plaintiff showed the shirt to Defendant Rabbitt himself, telling him that his mother "sat up a long time last night fixing this for me" (Goodwin Dep., p. 122, ll. 6–10). Defendant Goodwin

also testified that Defendant Rabbitt did not make any comment to her about the shirt (Goodwin Dep., p. 122, ll. 17–18).

Defendant Goodwin gave Plaintiff a suspension notice (Smith Dep., p. 72, l. 25 to p. 73, ll. 1–4; Goodwin Dep., p. 125, ll. 5–14). On the suspension notice, Defendant Goodwin wrote that "Adam is suspended until Mon., April 6." (Rabbit Dep., Pl.'s Ex.23). With respect to the basis for the suspension, Defendant Goodwin wrote that "Adam has been disruptive, unresponsive, surly, and instigating feelings of discord." (Rabbit Dep., Pl.'s Ex.23).

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(c); *Edwards v. Shalala*, 64 F.3d 601, 603 (11th Cir.1995). If the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case," the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

In reviewing a motion for summary judgment, the court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. *See Maynard v. Williams*, 72 F.3d 848, 851 (11th Cir.1996). Even if there exists some alleged factual dispute between the parties, summary judgment is not necessarily improper; there must be a genuine issue of *material* fact to render summary judgment improper. *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. *Defendants' Immunity From Suit*

#### 1. Greene County School District

■ A municipality may not be held liable under 42 U.S.C. § 1983 on a theory of *respondeat superior*. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.E.2d 611 (1978). Instead, "[i]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037–38. Moreover, municipal liability may be imposed for a single decision by a municipal policymaker where "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (footnote omitted). A municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review. *See Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir.1997).

■ The Court must determine whether Defendant Goodwin and Defendant Rabbitt had final policymaking authority with respect to the plaintiff's suspension.[4] Plaintiff was suspended for three days. During his deposition, Defendant Rabbitt testified that he only gets involved in student discipline when students are disciplined for more than ten days (Rabbitt Dep., p. 25, ll. 18–22). In Greene County, school principals have the authority and discretion to impose out-of-school suspensions of ten days or less (Rabbit Dep., p. 25, ll. 20–25; Lanham Dep., Defs.' Ex.17). As a result, Defendant Rabbitt did not

---

4. Having concluded that the dress code is not facially unconstitutional (*see infra* Part II.D.), the Court need not engage in an analysis of whether Defendants Goodwin and Rabbit are final policymakers with respect to this subject matter.

possess final authority to establish municipal policy with respect to the plaintiff's suspension.

Defendant Goodwin, as the principal of Union Point Elementary School, acted within her discretionary authority when she suspended the plaintiff from school for three days. The school district has not argued that Defendant Goodwin is not a final policymaker with respect to out-of-school suspensions of ten days or less. The only evidence regarding administrative review of Defendant Goodwin's disciplinary decisions is a letter that the counsel for the Greene County Board of Education wrote to Ms. Lanham regarding her request for a hearing before the board of education. In this letter, counsel wrote that, "having granted [the discretion to impose out-of-school suspensions of up to ten days] to its principals, the board of education does not and will not conduct a hearing or otherwise hear challenges to those decisions." (Lanham Dep., Defs.' Ex.17). Counsel for the board of education also wrote that the board of education encourages "parents to attempt to resolve concerns or objections they may have regarding school discipline by discussing the issues directly with the principal and, if necessary, discussing the issues with the superintendent who is the direct supervisor of the principal." (*Id.*). As this letter indicates that Defendant Goodwin was authorized to function without any formal system of review, the Court concludes that the school district did delegate to Goodwin final policymaking authority with respect to out-of-school suspensions of ten days or less. *Cf. Mandel v. Doe*, 888 F.2d 783, 792–94 (11th Cir.1989) (finding that discretionary review initiated by the municipal official herself does not prevent the official from being a final policymaker).

### 2. Defendants Goodwin and Rabbitt

Qualified immunity protects government officials who have acted within their discretionary authority from suit and liability "if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Alabama A & M University*, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity shields government actors from liability in damage claims against them in their individual capacities in all but exceptional cases. *See Lassiter*, 28 F.3d at 1149.

The Eleventh Circuit applies a two-part analysis to a government official's assertion of qualified immunity. First, the official must prove that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the defendant meets that burden, the plaintiff must prove that the official's conduct violated clearly established law. *See Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir.1998) (citing *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir.1997)).

With respect to the first part of the inquiry, the parties do not dispute that Defendants were acting within their discretionary authority at all relevant times. The Court will consider the parties' silence on this issue as an agreement that the challenged actions were within Defendants' discretionary authority. *See, e.g., Jones v. Cannon*, 174 F.3d 1271, 1282 n. 2 (11th Cir.1999). Thus, the Court will proceed to consider the second part of the qualified immunity inquiry—whether Defendants' conduct violates clearly established constitutional rights of which a reasonable person would have known.

Based on its review of the record and the law applicable to Plaintiff's claims, the Court concludes that Defendants' conduct did not violate Plaintiff's constitutional rights.

### C. First Amendment

Defendants first argue that Plaintiff has produced no evidence that he was

unlawfully disciplined or otherwise adversely affected based upon the exercise of his First Amendment rights. "To succeed in a section 1983 suit based on a claim of retaliation for speech, the plaintiff must show that his speech was a 'substantial' or 'motivating' factor in the allegedly retaliatory decision." *Gattis v. Brice,* 136 F.3d 724, 726 (11th Cir.1998). Defendants argue that the undisputed evidence shows that Plaintiff's shirt was not a factor in Defendant Goodwin's decision to suspend him. Conversely, Plaintiff argues that the evidence from the record establishes that the basis for Plaintiff's suspension was the civil rights shirt.

To show that the shirt was a substantial or motivating factor in the decision to suspend Plaintiff, Plaintiff relies on the testimony of Ms. Grant, Ms. Robbins, and Ms. Brown. This testimony shows that Ms. Grant was concerned about the shirt in reference to the dress code and all three were concerned about the offensiveness of the shirt. However, during her deposition, Defendant Goodwin responded to counsel's questions about whether the shirt prompted her to suspend Plaintiff by repeatedly stating that Plaintiff was suspended based on his course of conduct during the events preceding the suspension, not because of the shirt (Goodwin Dep., pp. 108–122). For example, Defendant Goodwin testified as follows:

B. I told him [Defendant Rabbitt] that I felt that this was a suspendible offense.

Q. What was?

A. The whole incident with Adam starting, number one with calling her [Ms. Robbins] a liar, but I had tried to work through that in many other ways. That his not speaking to me, his very surly response to me. When you cannot speak to a student and get any sort of response from them except a look of disgust, that's pretty difficult to deal with.

Q. You took it as a look of disgust?

A. Well, it was a look of something. It certainly was not a response that I would have expected from a student. It was not an appropriate response.

Q. Okay. Did you punish him in any way as a result of that response?

A. No. I simply told him I was not going to argue with him, because I didn't see any reason to make it bigger than it was.

(Goodwin Dep., p. 108, ll. 20–25 to p. 109, ll. 1–14).

Q. I think I asked what was the suspendible offense.

A. The whole chain of events, and this was the final straw.

Q. And what was the final straw?

A. His response to people that he wore the shirt for Ms. Robbins, that "Even Adults Lie", that's for Ms. Robbins. But the fact that the students got so upset by it. The issue was my school was upset, well at least a portion was upset.

(Goodwin Dep., p. 111, ll. 4–13).

Q. Okay. You keep saying, "It was a suspendible offense."

A. The whole chaos Adam had created, but primarily any other student who had refused to respond to me as a principal, I would have suspended from school. It was utter defiance. It was the utmost defiance, and I let it go. But by the time all the other stuff accumulated, I just couldn't let it go anymore.

Q. When you say "other stuff."

A. The in the hall with the shirt and just all of it together was just too much.

(Goodwin Dep., p. 115, ll. 1–12).

Q. The incident that prompted you to take action and suspend Adam was what Ms. Grant said about him wearing the shirt and pointing to the back and saying, "That's for Ms. Robbins" and the disturbance it caused; is that correct.

A. No, it was the final act of defiance.

MR. PARKER: Same objections

A. Final act of defiance.

Q. (By Mr. Beasley) Which was what?

A. Of his doing whatever he felt like he wanted to do.

Q. Okay. And what was that final act of defiance?

A. Walking out in the hall and saying, "This is for Ms. Robbins." But not speaking to me and all of those things, it was really the issue of defiance, Mr. Beasley. And I can't run a school if students don't even respond to me.

(Goodwin Dep., p. 116, ll. 17–25 to p. 117, ll. 1–10).

Plaintiff also points to Ms. Lanham's allegation that, when her sister asked him if the plaintiff was suspended because of the shirt, Defendant Rabbit replied "you're damn right he did, you were a fool to send him to school wearing that shirt" (Lanham Dep., p. 76, ll. 18–22).[5] Defendant Rabbitt "adamantly" denies making this statement (Rabbitt Dep., p. 68, ll. 15–19).

■ The foregoing excerpts show that the disruption Plaintiff caused by wearing the shirt was the final act of defiance in a series of acts leading up to Plaintiff's suspension. As Plaintiff points out, Defendant Goodwin did not suspend Plaintiff until the shirt and the disruption caused by Plaintiff wearing the shirt were brought to her attention. In addition, as the Court cannot engage in credibility determinations at the summary judgment stage, the Court must accept as true Ms. Lanham's allegation that Defendant Rabbitt told her that Plaintiff was suspended because of the shirt. From this evidence, a jury could find that the shirt was a motivating factor

behind Defendant Goodwin's decision to suspend the plaintiff.

Even so, the Court concludes that Defendants did not violate Plaintiff's First Amendment right to free speech. Both Plaintiff and Defendants agree that the standard set forth in *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), applies in this case. In *Tinker*, a group of adults and students determined to publicize their objections to the hostilities in Vietnam by wearing black armbands during the holiday season. After they became aware of the plan, the principals of the Des Moines schools met and adopted a policy that any student wearing an armband would be asked to remove it, and, if he refused, he would be suspended until he returned without the armband. When three of the students wore their armbands to school, they were all sent home and suspended until they would come back without their armbands.

The Supreme Court held that, in the absence of any facts which might reasonably have led school authorities to forecast substantial disruption of, or material interference with, school activities or any showing that disturbances or disorders on school premises in fact occurred when the students wore black armbands on their sleeves to exhibit their disapproval of Vietnam hostilities, the policy adopted by the principals constituted an unconstitutional denial of the students' First Amendment right of expression. *Tinker*, 393 U.S. at 514, 89 S.Ct. at 740. The Supreme Court also stated that school officials' "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508, 89 S.Ct. at 737. It is only where school offi-

---

5. Although Plaintiff requested that Defendants file the deposition of Erica Whitman (tab # 53), Defendants failed to do so. However, Plaintiff attached a copy of a page from Ms. Whitman's deposition to his appendix of relevant exhibits (tab # 52, Ex. L). During her deposition, Ms. Whitman, Ms. Lanham's sister, testified that she asked Defendant Rabbitt

if Plaintiff was suspended because of his shirt (Dep. of Erica Whitman, p. 34, ll. 17–20). According to Ms. Whitman, Defendant Rabbitt replied: "[Y]ou damn right it was because of that shirt. You was a fool to send your son to school with that shirt" (Whitman Dep., p. 34, ll. 21–23).

cials reasonably believe that a student's uncontrolled exercise of expression might "substantially interfere with the work of the school or impinge upon the rights of other students" that they may restrict such expression. *Id.* at 509, 89 S.Ct. at 738. Defendants may satisfy their burden under *Tinker* by showing that "engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the school' "*Id.* at 509, 89 S.Ct. at 738 (citing *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir.1966)).

The facts in this case are significantly different from those in *Tinker.* In *Tinker,* the school principals adopted a policy which specifically prohibited the wearing of armbands. When the students wore the armbands to school, they were suspended until they would return to school without the armbands. The record did not demonstrate that the students sought to interfere with the requirements of appropriate discipline in the school. The record did not show that the plaintiffs were involved in a series of events which culminated in the wearing of the armbands as an act of defiance. The plaintiffs in *Tinker* were suspended for no reason other than "wearing on their sleeve a band of black cloth, not more than two inches wide." 393 U.S. at 514, 89 S.Ct. at 740. Conversely, in this case, the school did not have a policy which specifically prohibited the wearing of all shirts with writing. When Plaintiff wore the shirt to school, Defendant Goodwin did not ask him to remove the shirt or tell him that he could not return to school wearing the shirt. The wearing of the shirt, unlike the wearing of the armbands in *Tinker,* was the final act of defiance in a series of incidents which began when Plaintiff told Ms. Robbins that she was lying. Although wearing the shirt may have been a factor in Plaintiff's suspension, it was not the sole reason for Plaintiff's suspension. Defendant Goodwin suspended Plaintiff for a three day period for the stated reasons of being "disruptive, unresponsive, surly, and instigating feelings of discord." The rec-

ord clearly demonstrates that Plaintiff sought to materially and substantially interfere with the requirements of appropriate discipline in the school.

Plaintiff relies on the conflicting evidence regarding the existence of a disturbance among the students to argue that Defendants have not shown that Plaintiff's shirt substantially interfered with the work of the school. However, even if some factual dispute exists between the parties, summary judgment is not necessarily improper; there must be a genuine issue of *material* fact to render summary judgment improper. If Defendant Goodwin had suspended Plaintiff for no reason other than wearing the shirt, then a genuine issue of material fact as to the level of disruption caused might render summary judgment improper. The record clearly indicates, however, that Defendant Goodwin did not suspend Plaintiff merely for wearing the shirt.

Plaintiff cites to *Chandler v. McMinnville School District,* 978 F.2d 524, 531 (9th Cir.1992) for the proposition that, "where arguably political speech is directed against the very individuals who seek to suppress that speech, school officials do not have limitless discretion." The Court accepts this proposition as binding authority. In this case, however, Plaintiff's suspension was a disciplinary action, not an effort to suppress Plaintiff's right of expression. Defendants properly exercised their authority to prescribe and control conduct in the schools. *See Tinker,* 393 U.S. at 507, 89 S.Ct. at 737. Plaintiff's case does not present one of those rare instances when federal courts should "intervene in the resolution of conflicts that arise in the daily operation of school systems." *Board of Educ., Island Trees Union Free Sch. Dist. v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (internal quotation and citation omitted). Accordingly, Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.

## D. *Substantive Due Process*

Plaintiff challenges the Union Point Elementary School's dress code under the First and Fourteenth Amendments, arguing that it is unconstitutionally vague and overbroad. The dress code reads, in pertinent part, as follows: "Dress must contain neither offensive writing, pictures, or symbols or sexual, alcohol, tobacco, or drug messages. Jewelry must also conform to this requirement." (Rabbitt Dep., Pl.'s Ex. 1). Specifically, Plaintiff challenges the portion of Union Point Elementary School's dress code prohibiting "offensive writing, pictures, or symbols."

With respect to an as applied challenge to the dress code, there is no evidence to support a finding that a violation of the school's dress code was the basis for Plaintiff's suspension from school. Plaintiff contends that "it is clear that Smith's shirt became the subject of controversy because Ms. Grant felt that, in light of the dress code, the shirt was offensive." During her deposition, Ms. Grant testified that she went to see Defendant Goodwin to talk to her about the plaintiff's shirt because she "didn't feel good about him wearing that shirt" (Grant Dep., pp. 52–53). Ms. Grant stated that "there is a big thing about what we wear, and we are not supposed to wear these things with certain pictures and sayings on them and advertising and stuff like that" (Grant Dep., p. 52, ll. 10–13). Additionally, Ms. Grant testified that if any child "had on something that I felt like was offensive to other kids or anyone, I would have gone to the principal, because I knew that we have a standing rule that we are to be careful of what the children wear" (Grant Dep., p. 53, ll. 13–18). Ms. Robbins testified that the teachers discussed the offensiveness of Plaintiff's shirt in Defendant Goodwin's office and stated that she was offended by the phrase "all adults lie" printed on the shirt (Robbins Dep., pp. 43–44).

Although the evidence shows that Ms. Grant and Ms. Robbins considered the words on Plaintiff's shirt to be offensive, this evidence does not lead to the conclusion that Defendant Goodwin suspended Plaintiff for violating the school's dress code by wearing a shirt to school with offensive writing on it. Plaintiff has not provided any evidence to the Court that Defendant Goodwin considered the writing on Plaintiff's shirt to be offensive or that she found the writing on the shirt to be prohibited by the dress code. During her deposition, Defendant Goodwin testified that Ms. Grant reported a disturbance rather than a violation of the dress code (Goodwin Dep., pp. 102–107). In response to counsel's questions about whether the shirt prompted her to suspend Plaintiff, Defendant Goodwin repeatedly went over the reasons that she suspended him and repeatedly stated that the shirt was not at issue (Goodwin Dep., pp. 108–122). Moreover, Defendant Goodwin did not make reference to either the shirt or the dress code in the suspension notice that she gave to Plaintiff.

The only evidence that Plaintiff has produced that links Plaintiff's suspension specifically to the shirt is Ms. Lanham's allegation that, when her sister asked him if the plaintiff was suspended because of the shirt, Defendant Rabbitt replied "you're damn right he did, you were a fool to send him to school wearing that shirt." However, this allegation does not show that a violation of the school's dress code was the basis for Plaintiff's suspension from school. Defendant Rabbitt allegedly told Ms. Lanham that Plaintiff was suspended because of the shirt, not because the shirt that Plaintiff wore violated Union Point Elementary School's dress code. Plaintiff has not established that Defendant Goodwin suspended Plaintiff as punishment for violating the school's dress code.

■■ Having disposed of any challenge to the dress code as applied, the Court will next consider Plaintiff's facial challenge to the dress code. The Court begins with the principle that "[a] facial challenge to [an enactment] is ... the most difficult challenge to mount successfully, since the

challenger must establish that no set of circumstances exists under which the [enactment] would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Plaintiff does not argue that application of the dress code would be unconstitutional in all circumstances. Such an argument would not be successful because there is certainly an unmistakable core of offensive writing, pictures, or symbols on clothing that a school can constitutionally prohibit a student from wearing on school property. *See, e.g., Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (recognizing school officials' ability to act for the protection of minors from exposure to vulgar and offensive spoken language). Moreover, the dress code is not so vague as to leave the students or their parents without knowledge of the nature of the clothing that is prohibited on the premises of Union Point Elementary School.

The Court notes that, in *City of Chicago v. Morales*, 527 U.S. 41, 54, 119 S.Ct. 1849, 1858–59 n. 22, 144 L.Ed.2d 67 (1999), Justice Stevens, joined by Justices Souter and Ginsburg, concluded that state courts need not apply the *Salerno* test. While questioning whether it would be appropriate for federal courts to apply the *Salerno* standard, Justice Stevens declined to resolve the continuing viability of the *Salerno* doctrine in federal courts. *Id.* Thus, this Court will apply the *Salerno* test until the Supreme Court determines that the doctrine does not apply in federal courts or the Court of Appeals directs district courts in the Eleventh Circuit not to apply the doctrine.

Consistent with the foregoing, the Court concludes that instances of arbitrary enforcement of the dress code "are best addressed when (and if) they arise, rather than prophylactically through the disfavored mechanism of a facial challenge on vagueness grounds." *City of Chicago*, 527 U.S. at 111–12, 119 S.Ct. at 1886 (Thomas, J., dissenting). In this case, Plaintiff has not shown that the dress code was enforced against him, arbitrarily or otherwise.

 There is an exception to the rule that courts will not pass upon facial challenges to enactments—the overbreadth doctrine. *See **Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent**, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago*, 527 U.S. at 52, 119 S.Ct. at 1857. The overbreadth doctrine is not to be casually employed. *See Los Angeles Police Dep't v. United Reporting Publishing Corp.*, —— U.S. ——, 120 S.Ct. 483, 489, 145 L.Ed.2d 451 (1999). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court for it to be facially challenged on overbreadth grounds." *Members of the City Council*, 466 U.S. at 801, 104 S.Ct. at 2126.

 When considered in the public school context, the dress code does not reach a substantial amount of constitutionally protected conduct. In *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Supreme Court held that a school district acted entirely within its permissible authority in imposing sanctions upon a student in response to an offensively lewd and indecent speech, which it concluded had no claim to First Amendment protection. While recognizing that the First Amendment guarantees wide freedom in matters of adult public discourse, the Supreme Court stated that "[i]t does not follow ... that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public

school." *Fraser*, 478 U.S. at 682, 106 S.Ct. at 3164. The Supreme Court also stated that "[s]urely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." 478 U.S. at 683, 106 S.Ct. at 3164. Given that the Supreme Court has recognized the authority of a public school official to prohibit offensive speech, there is no realistic danger that the dress code significantly compromises recognized First Amendment protections of parties not before the Court. Therefore, the dress code is not unconstitutionally overbroad.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's substantive due process claim.

### E. *Procedural Due Process*

██ Plaintiff contends that his "suspension deprived him of both property and liberty interests without reference to any rules or procedures and without proper notice and hearing and in violation of his rights to procedural due process under the Fourteenth Amendment to the United States Constitution" (Compl. (tab # 1), para. 50). As to public school suspensions of ten days or less, "the process provided need consist only of 'oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.' " *C.B. By and Through Breeding v. Driscoll*, 82 F.3d 383, 386 (11th Cir.1996) (citing *Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975)).

██ The undisputed evidence shows that Plaintiff received written notice of the charges against him (Rabbitt Dep., Pl.'s Ex. 23; Smith Dep., p. 72, l. 25 to p. 73, ll. 1–6; Lanham Dep., p. 53, ll. 9–11; Goodwin Dep., p. 125, ll. 5–14). In addition, Defendant Goodwin testified that she read the statement on the suspension notice to the plaintiff and explained to him the meaning of the statement (Goodwin Dep., p. 135, ll. 16–25 to p. 136, ll. 1–24). Nei-

ther Plaintiff nor his mother attempted to deny the charges against him. The plaintiff testified that, after he received the suspension notice, "[i]t was time to go home and I took it and left and got on the bus and went home and started crying and gave it to my mom" (Smith Dep., p. 73, ll. 8–10). Ms. Lanham testified that, after Adam came home, she called the school and asked to speak with Defendant Goodwin, who had left for the day (Lanham Dep., p. 52, ll. 20–25 to p. 53, l. 1–4). Ms. Lanham did not leave a message for Defendant Goodwin to return her call (Lanham Dep., p. 53, ll. 6–8) and does not recall ever speaking with Defendant Goodwin or any other school personnel about the suspension (Lanham Dep., p. 72, ll. 22–25; p. 74, ll. 24–25 to p. 75, ll. 1–3; p. 95, ll. 11–13).

On April 6, 1998, Ms. Lanham spoke with Defendant Rabbitt about the plaintiff's suspension (Rabbitt Dep., p. 63, ll. 3–6, 24–25 to p. 64, l. 1). Defendant Rabbitt directed her to speak with Defendant Goodwin (Rabbitt Dep., p. 65, ll. 15–16). When Ms. Lanham informed him that Defendant Goodwin would not give her the answers she wanted, Defendant Rabbitt told her that, if she would give him the questions in writing, he would get the answers to the questions for her (Rabbitt Dep., p. 65, ll. 17–20). The record contains no indication that Ms. Lanham acted on this offer. The undisputed evidence shows that Plaintiff and his mother never sought from Defendant Goodwin an explanation of either the evidence that Defendant Goodwin had or the basis for her decision to suspend Plaintiff. Moreover, there is no evidence that, had Plaintiff or his mother asked Defendant Goodwin for an opportunity to discuss the suspension, Plaintiff would have been denied an opportunity to present his side of the story. Based on the foregoing, the Court concludes that Plaintiff received all the process due him under the Fourteenth Amendment. Because Plaintiff did not suffer a deprivation of procedural due process sufficient to sus-

tain a § 1983 claim, summary judgment on this claim is granted to Defendants.

### F. *State Law Claims*

Pursuant to 28 U.S.C. § 1367(a), in any civil action in which a federal district court has original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. Pursuant to § 1367(c), however, a district court may decline to exercise such supplemental jurisdiction if the district court has dismissed all claims over which it had original jurisdiction.

When subsection (c) permits a court to decline to exercise its jurisdiction, the court's discretion should be guided by the factors described in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966): judicial economy, convenience, fairness to the parties, and comity. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 1004–05 (11th Cir.1993). Typically, where federal claims are dismissed before trial, these factors will favor dismissal of the state claims. *See, e.g., Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 (encouraging dismissal of state law claims when federal law claims dismissed prior to trial); *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) ("When federal law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Baggett v. First Nat'l Bank of Gainesville,* 117 F.3d 1342, 1352–53 (11th Cir.1997) (dismissing state law claims without prejudice where defendant's motion to dismiss granted).

The Court concludes that the state law claims remaining in this action are best resolved by the Georgia courts. *See Hardy v. Birmingham Bd. of Educ.,* 954 F.2d 1546, 1553 (11th Cir.1992) ("State courts, not federal courts, are the final expositors of state law."). Plaintiff's remaining claims raise issues of state law, including sovereign and official immunity, that do not implicate federal interests. Because 28 U.S.C. § 1367(d) tolls any applicable state statute of limitations, there is no unfairness to Plaintiff resulting from dismissal. The Court finds that judicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts. Accordingly, the Court dismisses Plaintiff's state law claims.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is hereby **GRANTED** as to all federal claims. Plaintiff's state law claims are hereby **DISMISSED WITHOUT PREJUDICE.**