**Keven J. MACK, Plaintiff,**

v.

**AUGUSTA–RICHMOND COUNTY, GEORGIA, and George Kolb, in his Individual and Official Capacities, Defendants.**

*Civil Action No. CV 103–178.*

United States District Court,
S.D. Georgia,
Augusta Division.

April 18, 2005.

John M. Brown, Augusta, GA, for Plaintiff.

Todd Boudreaux, Daniel W. Hamilton, Plunkett, Hamilton, Boudreaux & Tisdale, LLP, Evans, GA, for Defendants.

## ORDER

BOWEN, District Judge.

Before the Court in the captioned case is Defendants' motion for summary judgment on all of Plaintiff's claims. Oral argument on the motion was heard on March 10, 2005. Based upon the briefs and argument of counsel, the record evidence, and the relevant law, Defendants' motion for summary judgment is **GRANTED.**

### I. FACTUAL BACKGROUND

Plaintiff has sued Defendants for terminating him in violation of his First Amendment rights, pursuant to 42 U.S.C. § 1983, and in violation of the federal whistle blower statute, 31 U.S.C. § 3730. Plaintiff also asserts a breach of contract claim involving Defendants' alleged promise to credit prior service years toward Plaintiff's retirement benefits.

Plaintiff began his employment with Augusta, Georgia, in January of 1992 and was appointed as the Director of Housing and Neighborhood Development (hereinafter "the Department") for the consolidated government of Augusta–Richmond County in November of 1996.[1] (Defs.' St. of Undisputed Mat. Facts, ¶ 1.) As the head of the Department, Plaintiff's job responsibilities included overseeing Augusta's disbursement of grant money from the United States Department of Housing and Urban Development ("HUD") through the Community Development Block Grant program ("CDBG"). Plaintiff was responsible for efficiently managing the Department and ensuring that project funding complied with the applicable regulations. (*Id.* ¶ 2.)

After the time of Plaintiff's hire, the Inspector General's Office for HUD performed an audit of the Department. (Dep. of Richard Persig, at 5–6.) The audit primarily covered years prior to consolidation, from 1992 through 1996. Pursuant to the audit, the Inspector General's Office issued a highly critical report of Augusta's oversight of HUD funding in December of 1998. (*Id.* at 11–13, Ex. 36.) The report particularly noted several problems with conflicts of interest and other procurement violations in HUD funding. The report specifically found that Augusta improperly used CDBG funds for projects that did not meet national objectives of the CDBG program and recommended that Augusta be required to reimburse the CDBG program for the ineligible costs. (*Id.*)

Plaintiff claims that he worked closely with HUD to avoid the penalties and to protect against future penalties. In so doing, Plaintiff claims he gained the antipathy of Commissioner Lee Beard because Plaintiff refused to provide funds on certain projects without going through the necessary paperwork and bidding procedures, contrary to Beard's insistent requests.[2] (*See generally* Dep. of Keven Mack, at 32–34; Aff. of Keven Mack, ¶¶ 6–8.)

Sometime in 2000, Augusta named the East Augusta Community Development Corporation ("East Augusta"), a Georgia non-profit corporation, as a Community Development Housing Organization ("CDHO"). CDHOs are development partners eligible for HUD funds through the CDBG program. (Mack Dep. at 40–41; Dep. of John Kemp, at 19; Dep. of George Kolb, at 41, 45.) In January of 2001, East Augusta attended an annual meeting of CDHOs to learn about the HUD procurement requirements. (Mack Aff. ¶ 11.)

On or about May 4, 2001, Augusta executed a contract with East Augusta to oversee the rehabilitation of the Lincoln Square Apartments in Augusta.[3] Pursuant to this agreement, East Augusta would act as a sub-recipient of CDBG funds provided to Augusta by HUD. Through the sub-recipient contract, Augusta was to provide East Augusta $500,000 of CDBG funds as partial funding for the Lincoln Square project. (Defs.' St. of Undisputed Mat. Facts, ¶ 3.)

---

1. For simplicity's sake, I will refer to the consolidated government, a defendant in this case, as "Augusta" hereinafter.

2. Beard was named as a defendant in the case; however, on February 25, 2004, a suggestion of death for Beard was filed. On April 28, 2004, Beard was dismissed from the case.

3. The Lincoln Square project involved the remodeling and renovation of 148 units in a low-income, multi-family development. (Kemp Dep. at 26; *see also* Mack Aff. ¶ 9; Ex. D to Defs.' Memo. of Law Supp. Mot. for Summ. J.)

East Augusta's use of CDBG funds was subject to the requirements of the Housing and Community Development Act of 1974, 88 Stat. 633, as amended, 42 U.S.C. §§ 5301 *et seq.*, and all other regulations concerning the CDBG program, *see generally* 24 C.F.R. Part 570 *et seq.*[4] That is, any contract bidding for the Lincoln Square project had to be done in compliance with HUD guidelines. (*Id.* ¶ 4; Kemp Dep. at 22; Mack Dep. at 39–42.) In the event of any non-compliance with HUD guidelines for bidding procedures, Augusta could be required to repay all funds disbursed under the CDBG. (Mack Dep. at 42.) East Augusta actually pulled in a procurement partner on the project, Capital Development Corporation, which was supposed to help East Augusta stay in compliance with HUD funding requirements. (Kemp Dep. at 25–26.)

After the sub-recipient contract was executed in May 2001, Norman Michael and John Kemp, employees in Plaintiff's Department, scheduled a meeting with East Augusta to discuss the bidding procedures needed to be employed to comply with HUD regulations. At this meeting, Michael and Kemp learned that East Augusta had already entered into a contract with Gold Mech, Inc. for the Lincoln Square rehabilitation project without soliciting competitive bids as required by the HUD regulations. (Defs.' St. of Undisputed Mat. Facts, ¶ 5.)

John Kemp informed Plaintiff of the contract award when he returned to the Department office that day. (Kemp Dep. at 16.) The Department then asked East Augusta and its partner, Capital Development Corporation, to explain its bidding process. Capital Development Corporation sent a letter explaining that it had decided that only two contractors in Augusta were suitable for the project, and it unilaterally selected one of the two. (*Id.* at 16, 30.) Upon receiving this letter, Kemp notified a senior financial analyst with HUD, Tony R. Simmons, and asked his opinion about the procurement.[5] (*Id.* at 23–24.) Simmons issued a memorandum dated May 17, 2001, in which he opined that Capital Development Corporation violated HUD regulations by not publishing notice of the bid and not using an open and competitive bidding process. (Aff. of Tony Simmons, Sept. 9, 2004, Ex. 3.) On May 22, 2001, Kemp wrote a memorandum to Norman Michael, with a copy to Plaintiff, suggesting that the project be placed on hold until the situation was resolved. (Kolb Dep. at 53–54, Ex. 4.)

In the months to follow, it appears that East Augusta and the Capital Development Corporation were either uncooperative or unresponsive to requests for additional information from the Department. (Kemp Dep. at 16, 55–56; Mack Dep. at 38, 46.) At some point, several Augusta commissioners and Augusta's attorney became involved with the problem. Augusta continuously worked with HUD to resolve the matter. (Kolb Dep. at 44; Mack Dep. at 49; Aff. of Stella Taylor, Aug. 3, 2004, ¶ 6.)

On September 26, 2001, Plaintiff, several Augusta commissioners, Norman Michael, Jim Wall (then Augusta's attorney) and other city employees discussed via telephone the Lincoln Square bidding situation with Stella Taylor of HUD. In this conference call, Augusta and HUD agreed to

---

4. Even though East Augusta was to receive only $500,000 from CDBG funds for the $4.2 million project, it was required to comply with HUD regulations with respect to the entire contract. (Kolb Dep. at 44–45; Mack Dep. at 39–42; Kemp. Dep. at 27, 38.)

5. Stella Taylor of HUD testified that it was Norman Michael of Plaintiff's Department who called HUD in May of 2001. (Aff. of Stella Taylor, Sept. 3, 2004, ¶ 4.)

"carve out" three distinct contractual items from the overall project, totaling approximately $500,000, to be re-bid according to HUD regulations. (Defs.' St. of Undisputed Mat. Facts, ¶¶ 6–7.) Also, it was determined that the Purchasing Department for Augusta would handle the process for procuring the bids on the three separate items.[6] (Dep. of Geri Sams, at 11; Kolb Dep. at 59–60; Mack Dep. at 47.)

In setting up the re-bid process, Geri Sams of the Purchasing Department asked Plaintiff for assistance with ensuring compliance with the HUD regulations. (Sams Dep. at 14–15.) Plaintiff sent Norman Michael to assist and monitor Sams. (Id.; Mack Dep. at 55; Dep. of Norman Michael, at 21.) Plaintiff also told John Kemp that he wanted him to review the bid package to ensure compliance with the HUD regulations. (Kemp Dep. at 40; see Mack Dep. at 55.)

According to Sams, the final bid package was completed and hand-delivered by Michael to the Department on or about September 27, 2001. (Sams Dep. at 17.) The next day, the bid packages were mailed out to prospective bidders, including Gold Mech, Inc., and a copy was mailed to Plaintiff personally as Director of the Department. (Id.) As it turns out, John Kemp did not receive a copy of the re-bid package for review until October 11, 2001:

the day the bids were to be opened. (Kemp. Dep. at 46.)

About the same time in October 2001, Augusta's mayor, Bob Young, received a HUD audit dated October 2, 2001, which contained several criticisms of Plaintiff's Department. (See Kolb Dep., Ex. 35.) Mayor Young wrote a memorandum to Plaintiff shortly thereafter expressing his "deep" disappointment over the audit. (Id. at 101–03, Ex. 10.) He stated:

> Some of these issues are not new and should have been anticipated. That you [Plaintiff] did not fix them before they became problems is of concern to me and reflects on your ability to effectively manage your office. I view this [audit] as *your* annual performance review.

Plaintiff was directed to prepare a response to the audit by October 26, 2001. (Id., Ex. 10.)

The submitted bids on the three separate contract items were opened on October 11, 2001. (Sams Dep. at 26.) Norman Michael from Plaintiff's Department was in attendance. (Michael Dep. at 20.) At the bid opening, it was revealed that Gold Mech, Inc., had submitted the lowest bid for each of the three items.[7] (Kemp Dep. at 47.)

Plaintiff testified that he and John Kemp learned that Gold Mech, Inc. had received a solicitation to bid on October 11,

---

6. The three construction items involved appliances, painting, and floor covering. (Defs.' St. of Undisputed Mat. Facts, ¶ 7.) The Lincoln Square project had already been under construction for several months and other funds had been disbursed. (Kemp Dep. at 54.) In fact, the contractor, Gold Mech, Inc., was ready to paint several housing units at this time, and Augusta asked HUD whether it could expedite the notice requirement for the re-bid on an emergency basis. (Mack Dep. at 27–28; see generally Tr. of Good Hope Tape 1, Sept. 27, 2001.)

7. The parties sharply dispute whether HUD officials knew that Gold Mech, Inc., would be eligible to re-bid on the separate items. Defendants claim that HUD had been informed that Gold Mech, Inc. would be bidding on the three separate items. According to Jim Wall, he specifically brought this issue up with Stella Taylor on September 26, 2001, and she told him that not only was it permissible but encouraged. (Wall Dep. at 9–12.) On the other hand, Stella Taylor of HUD submitted an affidavit in which she stated that she never told Jim Wall that Gold Mech, Inc. should be allowed to re-bid the three contract items. (Aff. of Stella Taylor, Sept. 20, 2004, ¶ 7.)

2001. (Mack Aff. ¶ 19.) Plaintiff averred that he called HUD to inform it of Gold Mech's participation the next day. (*Id.*) On October 16, 2001, Plaintiff sent an e-mail to Jim Wall, stating that they needed to meet to discuss the procurement issue prior to awarding contracts on the re-bids. (*Id.*, Ex. L.) Gold Mech, Inc., however, had already been awarded the contracts by letters dated October 15, 2001. The letters were sent from the Purchasing Department under Sams' signature.[8] (Kemp. Dep. at 60–64.)

It appears that John Kemp also discussed the situation with HUD on October 16, 2001.[9] (Defs.' Memo. of Law Supp. Mot. for Summ. J., Ex. I.) Kemp sent an e-mail to Plaintiff right after midnight on October 17, 2001, in which he expressed extreme concern about the re-bid.[10] (*Id.*) He stated:

> While I was not involved in the conference you had with HUD—Atlanta, what you described to me seemed to be a sincere effort to correct the initial procurement deficiencies and to allow the project to proceed.
>
> . . . .
>
> The low bidder on all three projects was Gold Mech. Purchasing notified Gold Mech of award of these contracts yesterday, October 15th. What we have

now is a situation where the sub-contractor for these 3 items is also the General Contractor, in effect supervising themselves. Gold Mech should have been excluded from bidding on these items as a conflict of interest. They obviously have inside information as to the value of these contracts based on their initial bid for the entire project. Their bids strongly reflect this, as they are considerably lower than the next low bidder.

> I contacted HUD in Atlanta today and asked for an opinion on this procurement. After consulting with their procurement specialists, Stella Taylor indicated that they believe the procurement is also flawed. I also asked her if she thought that this would come up as a finding in a future HUD audit. She indicated that it would. . . .
>
> Keven, my opinion is that if we go ahead with this project as it now stands there is a very real possibility that Augusta will be found in a flagrant violation of HUD rules and could possibly have to repay the half million dollars that we will spend on this project. We have not spent any funds on this project up to now and I think we should immediately consult with Jim Wall for a legal opinion before proceeding. Once we

---

8. Sams testified that Norman Michael of Plaintiff's Department told her to award the contracts. (Sams Dep. at 41.)

9. Defendants claim that Kemp was the first person from Plaintiff's Department to notify HUD of Gold Mech, Inc.'s participation in the re-bid. (Defs.' St. of Undisputed Mat. Facts, ¶ 11.) Both Stella Taylor and Tony R. Simmons of HUD averred that Plaintiff never reported to HUD that CDBG funds were improperly being paid to Gold Mech, Inc. on the three re-bid contracts. (Defs.' Memo. of Law Supp. Mot. for Summ. J., Exs. G & H.) In fact, in his deposition, Plaintiff first testified that he could not recall discussing the Gold Mech, Inc. bid award with HUD prior to his

employment termination. Plaintiff admitted that Kemp was the first person from Augusta to contact HUD about Gold Mech, Inc.'s procurement of these items. (Mack Dep. at 67–68, 80, 85.) However, Plaintiff corrected his deposition testimony on an errata sheet, recalling that he called HUD about the situation on October 12, 2001. (Mack Dep. Errata Sheet (*e.g.*, "I started calling HUD on October 12, 2001, the day after the bid opening.").) Viewing the facts in a light most favorable to Plaintiff, I will accept that Plaintiff contacted HUD on October 12, 2001.

10. Plaintiff claims that Kemp sent the e-mail per his request. (Mack Aff. ¶ 20.)

have a definitive legal opinion on this, we should present any options we have to the Administrator and the Commission for a decision on how we should proceed since this could have a very adverse impact on the City of Augusta.

(*Id.*)

Upon receiving this e-mail from Kemp the morning of October 17, 2001, Plaintiff forwarded it to Jim Wall asking for his opinion and copied it to the City Administrator, George Kolb.[11] (Mack Aff., Ex. M.) Wall responded that he did not agree with Kemp's assessment and indicated that he had spoken with Stella Taylor of HUD to confirm that there was no problem with Gold Mech, Inc., participating in the re-bid. (*Id.*) Wall further indicated that this was entirely consistent with what he had told Plaintiff the day before. (*Id.*) Wall then stated that he would "appreciate [Plaintiff] not calling HUD for a second opinion on issues which you ask me to address—this merely complicates the whole process." (*Id.*)

On October 18, 2001, Defendant Kolb wrote an e-mail to Jim Wall in conjunction with the e-mails that were being transmitted between Jim Wall and Plaintiff about the re-bid process. Kolb told Wall that he needed a release document. Wall replied that he was working on it. (*Id.*)

On October 26, 2001, Plaintiff went to Kolb's office to deliver his response to the HUD audit. At that meeting, Kolb asked Plaintiff for his resignation and presented a severance package to him. Kolb told Plaintiff that if he did not resign, he would be terminated. (Mack Dep. at 22–23.) Upon inquiring as to why he was being released, Kolb allegedly responded that he did not like Plaintiff bringing up the fact that Gold Mech, Inc. had re-bid the contracts and that the contracts would have to be re-bid once again. (*Id.* at 23.) On November 20, 2001, at a regular meeting of the Commission, Kolb recommended to the Commission that Plaintiff's employment be terminated.[12] (*See* Defs.' Memo. of Law Supp. Mot. for Summ. J., Ex. E.)

In his deposition, Kolb provided the following specific reasons he recommended Plaintiff's termination:

- Plaintiff's lack of sufficient project management skills;

- Plaintiff's inability to make decisions without outside assistance; [13]

- Personnel issues arising within Plaintiff's Department; and

- Plaintiff's inability to handle community housing development organizations and projects such as the Lincoln Square project.

11. George Kolb is a defendant in this case. He was hired as the City Administrator for Augusta in May 2001 and served in that capacity during the termination of Plaintiff's employment. (Kolb Dep. at 5.) As City Administrator, Kolb supervised department heads, including Plaintiff, but he had no authority to hire and fire those department heads. That ultimate decision was left to the Augusta Commission. Kolb, however, could recommend the termination of a department head to the Commission. (*Id.* at 11.)

12. Plaintiff actually signed a "Release/Covenant Not to Sue" on October 29, 2001. (*See* Mack Aff., Ex. N.) Apparently, however, Plain-

tiff changed his mind about resigning. Plaintiff has attached a letter from his attorney to his affidavit filed in response to the motion for summary judgment which explains Plaintiff's position on the resignation. (*Id.*, Ex. O.) Defendants object to this letter as hearsay, as discussed in Section II *infra.*

13. Kolb referred to Plaintiff as "high maintenance" because Plaintiff could not make a decision without first calling someone else. In fact, Kolb testified that Stella Taylor of HUD called him to complain that Plaintiff had a book of regulations and should read them before calling her. (Kolb Dep. at 36–37.)

(Kolb Dep. at 35–44.) Kolb testified that Plaintiff's mismanagement of the Lincoln Square project was the straw that broke the camel's back. (*Id.* at 44.) He pointed out that all bidding and procurement problems, including poor communication control and management over Capital Development Corporation and East Augusta, were Plaintiff's responsibility. That is, Plaintiff was responsible for the effective and efficient operation of his Department. (*Id.* at 42–44, 48.) Kolb specifically mentioned that Plaintiff should have ensured HUD compliance during the re-bid process. (*Id.* at 63.)

The record does not demonstrate that any of these specific reasons were articulated to the Commission prior to its vote to terminate Plaintiff. While Kolb testified that he had spoken to the individual commissioners prior to the vote about Plaintiff, he could not recall any specifics about these conversations. (*Id.* at 32.) The Commission meeting minutes of November 20, 2001, reflect that Kolb recommended termination, stating only: "I have lost confidence in [Plaintiff's] ability to lead the Housing and Neighborhood Department effectively." (*See* Defs.' Memo. of Law Supp. Mot. for Summ. J., Ex. E.) Each of the individual commissioners have filed affidavits in which they state that they voted to terminate Plaintiff upon Kolb's recommendation. (*Id.*, Ex. K.)

Plaintiff has attached to his affidavit a letter faxed from his attorney to Jim Wall on the day of the Commission meeting,[14] in which Plaintiff's attorney pointed out that Kolb had ignored Plaintiff's accomplishments and chose only to criticize him about the Lincoln Square matter. (Mack Aff., Ex. O.) In conclusion, Plaintiff's attorney accused Kolb and the Commission of acting to terminate "a public employee for

protecting the public's trust." Plaintiff's attorney asked that the letter be presented to the Commission prior to the vote. (*Id.*)

The Commission voted seven-to-one to terminate Plaintiff. By letter dated November 26, 2001, Augusta officially notified Plaintiff of his termination effective November 20. (*See* Defs.' Memo. of Law Supp. Mot. for Summ. J., Ex. F.)

Ultimately, Augusta used CDBG funds in the amount of $403,845.21 for the Lincoln Square project. (Kolb Dep., Ex. 34, at 18–19.) During a subsequent audit performed nearly two years after Plaintiff's termination, HUD determined that the re-bid process used by Augusta for the three separate items did not comply with HUD regulations for competitive bidding and has requested that Augusta reimburse the $403,845.21 to the CDBG program. (*Id.*) According to counsel for Augusta, negotiations on this demand are on-going. (Oral Argument of March 10, 2005.)

Plaintiff filed the instant complaint on October 3, 2003. Plaintiff claims that he was terminated in retaliation for raising concerns and questions about Gold Mech, Inc.'s participation in the re-bid process and because he informed HUD of Augusta's anticipated improper expenditure of CDBG funds to Gold Mech, Inc. on the re-bid contracts.

## II. OBJECTIONS TO PLAINTIFF'S AFFIDAVIT

■ In response to Defendants' motion for summary judgment, Plaintiff filed an affidavit. Defendants have objected to the following statements in the affidavit relating to Plaintiff's federal claims:

- Plaintiff "conflicted with Commissioner Beard who was strong-willed and

---

**14.** Defendants object to the inclusion of this letter in the record based upon hearsay. This

objection will be addressed in Section II *infra.*

insistent that Augusta conduct business in a way that favored his family and friends. He also championed several projects for [State Senator] Charles Walker." (Mack Aff. ¶ 8.)

Defendants claim this statement is unsupported by the evidence of record. In his deposition, Plaintiff was asked how Commissioner Beard "pushed" so-called favorite organizations for funding. (Mack Dep. at 32.) Plaintiff responded that he and Commissioner Beard met every Monday for the first two months of Plaintiff's tenure as Director of Housing and Neighborhood Department, at which time Commissioner Beard would "push" for certain programs. (*Id.* at 32–34.) Plaintiff testified that he often refused Commissioner Beard's suggestions, especially if the requests had not gone through appropriate channels. (*Id.*) This testimony, however, does not specify that Commissioner Beard was trying to favor family and friends and makes no mention of Charles Walker. Accordingly, the objection to this statement in Plaintiff's affidavit is **SUSTAINED.**

- Plaintiff avers that he called HUD on October 12, 2001 to discuss the improper bid of Gold Mech, Inc. (Mack Aff. ¶ 19.)

■ Defendants claim this statement contradicts Plaintiff's deposition testimony that he could not recall contacting HUD about the re-bid prior to his termination. (*See* Mack Dep. at 79–80.) However, Defendants neglect to point out that Plaintiff provided an errata sheet to his deposition recalling this phone call. (Mack Dep. Errata Sheet (*e.g.,* "I started calling HUD on October 12, 2001, the day after the bid opening.").) Based upon this testimony, the affidavit does not conflict with the deposition. Defendants' objection to the statement is **OVERRULED.**

- "There is little doubt that I was released because I would not allow

spending of these funds to violate obvious conflict of interest prohibitions and government regulations." (Mack Aff. ¶ 26.)

■ Defendants claim that this statement directly contradicts Plaintiff's deposition testimony that he had no idea why the commissioners voted to terminate him. (Mack Dep. at 24.) Plaintiff argues that he was simply testifying that he has no direct evidence of the commissioners' mindset in voting, but that there is circumstantial evidence that the commissioners were following the improper recommendation of Kolb. I conclude that the statement is mere opinion on an ultimate issue of fact, i.e., the reason behind Plaintiff's termination. The burden of proof still falls upon Plaintiff to produce evidence beyond conclusory allegations. The statement is therefore immaterial, and I will **SUSTAIN** the objection.

- Defendants object to the admission of a letter written by Plaintiff's attorney to Jim Wall on the day of the Commission's vote to terminate Plaintiff. (Mack Aff., Ex. O.)

■ Defendants contend that the letter is hearsay. I will consider the letter, however, not for the truth of the matters asserted but as evidence on the issues of the Commission's motivation and knowledge. Accordingly, I hereby **OVERRULE** Defendants' objection to the letter's consideration at summary judgment.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. *Summary Judgment Standard*

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome

of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor," *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal punctuation and citations omitted).

 The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the non-moving party." *Four Parcels*, 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus*, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark*, 929 F.2d at 608.

 If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick*, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Fed.R.Civ.P. 56.

 The Clerk has given the non-moving party notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences

of default. (Doc. No. 26.) Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

## B. *42 U.S.C. § 1983*

■■■ Plaintiff contends that Defendants terminated him in retaliation for exercising his First Amendment free speech rights in violation of 42 U.S.C. § 1983.[15] This statute offers relief to "whistle blowers" when public employers retaliate against them for exercising their free speech rights on matters of public concern. *E.g., Pickering v. Board of Educ. of Township High Sch. Dist. 205, Will County,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Gonzalez v. Lee County Housing Auth.,* 161 F.3d 1290, 1295 (11th Cir.1998).

■■■ A four-part analysis governs these claims:

9) first, the employee must demonstrate that his speech involves a matter of public concern;

10) second, the employee must show that his First Amendment interests outweigh the state's interest in promoting the efficiency of public services;

11) third, if the first two elements are satisfied, the employee must prove by a preponderance of the evidence that

his speech played a substantial part in the adverse employment action; and

12) fourth, if the employee satisfies the first three elements, the state must prove by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech.

*Watkins v. Bowden,* 105 F.3d 1344, 1352–53 (11th Cir.1997) (quoting *Morgan v. Ford,* 6 F.3d 750, 753–54 (11th Cir.1993)). The first two issues are questions of law for the Court. *Kurtz v. Vickrey,* 855 F.2d 723, 732 (11th Cir.1988). Defendants have moved for summary judgment, arguing that Plaintiff cannot satisfy the four-part test which determines the validity of his § 1983 claim. Defendant Kolb also seeks qualified immunity in his individual capacity.[16]

■■■ In this case, Plaintiff claims that his questions and complaints about the re-bid process, specifically, the award of the re-bid to Gold Mech, Inc., was speech involving a matter of public concern for which he was terminated. Certainly, the administration of public funds, such as HUD funding, may be a matter of public concern. *See id.* at 729–30; *see also Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (suggesting that breach of public trust may be a public concern); *Fikes v. City of Daphne,* 79 F.3d 1079, 1084 (11th Cir.1996) (suggesting that allegations of misconduct are entitled to

---

**15.** Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

There is no dispute about whether Defendants were acting under color of state law.

**16.** Any federal claim against Defendant Kolb, the City Administrator, in his official capacity is considered the functional equivalent of a claim against the governmental unit for which he is employed. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991).

greater protection); *Peterson v. Atlanta Housing Auth.*, 998 F.2d 904, 916 (11th Cir.1993) (holding that compliance with a public agency's guidelines may be a matter of public concern). For purposes of this instant motion, I will assume without deciding that Plaintiff's complaints and questions about the re-bid process were a matter of public concern and that his free speech rights outweigh Defendants' interests in promoting the efficiency of public services performed by Plaintiff's Department.

▮ Moving then to the next part of the analysis, Plaintiff must show that a reasonable trier of fact could conclude that his speech on matters of public concern played a substantial role in his termination. *Morgan*, 6 F.3d at 754. I find that controlling authority of the Eleventh Circuit, namely *Matthews v. Columbia County*, 294 F.3d 1294 (11th Cir.2002), compels a determination that Plaintiff's § 1983 claim must fail.

In the instant case, the final decision-making authority to terminate Plaintiff rested with Augusta's Commission as an entity; thus, Augusta can be subject to liability only if the Commission itself acted with an unconstitutional motive in terminating Plaintiff. *Matthews*, 294 F.3d at 1297. In *Matthews*, a jury determined that one member of a county commission acted with an unconstitutional motive in voting to eliminate the plaintiff's job, specifically in retaliation for the plaintiff's exercise of her First Amendment rights. The jury further found that two other members of the commission were influenced in their vote by the commissioner with an unconstitutional motive. The jury returned a verdict for the plaintiff on her § 1983 claim that the job elimination was in violation of her First Amendment rights. *Id.* at 1295–96.

The Eleventh Circuit reversed the district court's denial of the defendant's mo-

tion for judgment as a matter of law, stating that "[a]n unconstitutional motive on the part of one member of a three-member majority is insufficient to impute an unconstitutional motive to the Commission as a whole." *Id.* at 1297. The *Matthews* court explained further that even though two commissioners may have known about the unconstitutional basis upon which one of the commissioners voted and even though the two commissioners' votes may have been so influenced, these facts were not enough to show that they ratified the unconstitutional motive in voting to eliminate the plaintiff's job. *Id.* at 1298. The Eleventh Circuit explained:

In reaching this conclusion, we draw ... upon our belief that a contrary rule would put lawmakers in an unacceptable position. Lawmakers' support for legislation can come from a variety of sources; one commissioner may support a particular piece of legislation for a blatantly unconstitutional reason, while another may support the same legislation for perfectly legitimate reasons. A well-intentioned lawmaker who votes for the legislation—even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even when his unconstitutionally motivated colleague influences his vote—does not automatically ratify or endorse the unconstitutional motive. If we adopt the rule suggested by Plaintiff, the well-intentioned lawmaker in this hypothetical would be forced either to vote against his own view of what is best for his county or to subject his county to Section 1983 liability. We think the law compels no such outcome.

*Id.* (footnote omitted).

In the case at bar, Plaintiff must demonstrate that the Commission's vote to terminate him was based upon his complaints and questions about the re-bid process. Plaintiff presents no direct evidence of the Commission's basis for the decision to ter-

minate him. In fact, each of the commissioners testified in an affidavit that they voted to terminate Plaintiff based upon Kolb's recommendation. (Defs.' Memo. of Law Supp. Mot. for Summ. J., Ex. K.) Plaintiff instead relies upon circumstantial evidence. He argues that Defendant Kolb recommended his termination in retaliation for Plaintiff's speech about the re-bid process and that the Commission thereafter ratified this improper motive by following Kolb's recommendation.[17]

Even assuming that Kolb's recommendation was given with an unconstitutional motive, Plaintiff's imputation of this motive to the Commission is unsupported by the evidence. In order for the Commission to ratify an unconstitutional motive of Defendant Kolb in its vote to terminate Plaintiff, the Commission must have known of the unconstitutional motive. The record in the case contains no evidence that any unconstitutional motive of Defendant Kolb was communicated to members of the Commission, except perhaps by way of the submission of Plaintiff's attorney's letter to the Commission on the day of the vote. I will address this letter in a moment.

For now, I wish to address a more fundamental lack of evidence. The record contains scant evidence that Defendant Kolb himself acted with an unconstitution-

al motive. Plaintiff argues that a jury could draw such inference from the following facts. Kolb was aware of the problems with Lincoln Square project. He learned Plaintiff continued to question the re-bid process after resolution with HUD when he became privy to an e-mail exchange on October 17, 2001, between Jim Wall and Plaintiff. In this exchange, Jim Wall told Plaintiff to stop calling HUD for a second opinion on the matter. In response to being copied on this e-mail, Kolb told Jim Wall that he needs a release document.

On the day of the meeting between Kolb and Plaintiff in which Plaintiff was asked to resign and sign a release, Kolb expressly stated that the Lincoln Square project was the reason he was asking for his resignation. Kolb does not dispute that he made this statement. Indeed, he testified that the Lincoln Square project was a large part of the decision to terminate, not because of Plaintiff's questioning of the re-bid process, but because of Plaintiff's mismanagement of the project from the start. Thus, even assuming Kolb recommended termination "because of the Lincoln Square project," there is a lack of evidence that this recommendation was unconstitutional retaliation as opposed to a decision to blame Plaintiff for the project's problems. It is not unconstitutional to termi-

---

**17.** Plaintiff also appears to argue that a jury could find the Commission decided itself to retaliate against Plaintiff for speaking out on matters of public concern. The evidence does not support this finding. Plaintiff presents the letter from his attorney submitted to the Commission on the day of the vote. The letter describes the Lincoln Square project as a pet project of a commissioner and intimates that the Commission first called for Plaintiff's resignation through Kolb. (Mack Aff., Ex. O.) However, as discussed in Section II, *supra*, the letter may not be used to establish the truth of any matter asserted. Accordingly, the letter cannot be used to establish that the Commission called for Plaintiff's resignation. Also, Plaintiff avers that Kolb told him he

could not protect Plaintiff from the Commission anymore. (Mack Aff. ¶ 23.). This statement is insufficient to show the motives of the individual commissioners let alone that their motives were unconstitutional. Plaintiff cannot demonstrate the Commission's unlawful motive through inadmissible hearsay, speculation, conjecture, assumptions of facts not in evidence, or speculative testimony of witnesses lacking personal knowledge. *See Macuba v. Deboer*, 193 F.3d 1316, 1322–24 (11th Cir.1999); *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir.1982). In short, there is no evidence of the motives of any Commissioner except as stated in their affidavits.

nate someone for poor management of a project. To draw the inference that Plaintiff's termination was in retaliation for questioning the re-bid process from these facts alone is a stretch. Nevertheless, perhaps there is enough of a temporal relationship between Plaintiff's protected speech and Kolb's request for separation papers and demand for resignation for a jury to infer retaliation.

I now return to the issue of whether the Commission ratified Kolb's retaliatory motive when it voted to terminate Plaintiff. First, the minutes of the November 20, 2001 Commission meeting show that Kolb's stated reason was that he had "lost confidence in [Plaintiff's] ability to lead the Housing and Neighborhood Department effectively." (*See* Defs.' Memo. of Law Supp. Mot. for Summ. J., Ex. E.) Thus, there is no evidence that a retaliatory motive was communicated to the Commission. Even if one were, however, *Matthews* teaches that the influence of an unconstitutional motive is not enough to establish that the Commission acted with an unconstitutional motive. Absent evidence that the Commission was actually motivated by an unconstitutional consideration, Augusta cannot be held liable under § 1983.

Plaintiff relies heavily on his attorney's letter submitted to the Commission and attached to the termination meeting minutes. (Mack Aff., Ex. O.) In the letter, counsel describes Kolb's adverse treatment and unwarranted criticism of Plaintiff in detail. The letter also speaks to Plaintiff's attempt to keep Augusta from running afoul of HUD regulations. (*Id.*) Reading the letter in a light most favorable to Plaintiff, it may be inferred that Plaintiff's attorney was warning that Kolb (and perhaps members of the Commission) were angry about Plaintiff's insistence on following the rules on the Lincoln Square

project; thus, counsel tells the Commission that it should not terminate Plaintiff for doing his job. The concluding paragraph reads as follows:

> I realize that political realities often "require" politicians to make marginal decisions. This is the reason that other public officials entrusted with the public's tax money be motivated by a rationale more attuned to prudent money practices. To criticize [Plaintiff] for doing his job is one thing. Everyone can exercise their right to speak out in a public forum. To discipline and/or terminate a public employee for protecting the public's trust is a clear violation of the First Amendment to the Constitution of the United States.

(*Id.*) According to Plaintiff, this letter placed the Commission on notice that a vote to terminate him would be a vote in violation of the First Amendment. The argument then goes that since the Commission voted to terminate him, it did so in contravention of his rights. Plaintiff's argument in this regard, however, is precisely the situation the Eleventh Circuit condemned in *Matthews*. That is, the letter puts well-intentioned commissioners into a situation in which they are forced to either vote against their view of what is best for the county or subject the county to § 1983 liability. Plaintiff simply cannot manufacture motive by placing it in the record with an ultimatum.

In conclusion, Plaintiff has failed to factually distinguish this case from the Eleventh Circuit precedent established in *Matthews*. Because there is no direct or circumstantial evidence that the Commission's motive in terminating Plaintiff was unconstitutional according to Eleventh Circuit precedent, Defendants are entitled to summary judgment on his § 1983 claim.[18]

---

**18.** Moreover, Defendant Kolb is entitled to

qualified immunity on this claim because

## C. *31 U.S.C. § 3730(h)*

██ Plaintiff alleges that his termination was an act of retaliation for protected conduct, in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* The False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government. *See* 31 U.S.C. § 3729. Section 3730(b) allows a private right of action against an entity for a violation of Section 3729 on behalf of said person and the United States government. Section 3730(h) provides "whistle blower" protection for any employee who takes lawful action in furtherance of an action under § 3730:

> Any employee who is discharged ... because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

In order to seek relief under the whistle blower statute, a plaintiff must show that (1) he engaged in protected conduct and (2) that the defendant retaliated against him because of that protected conduct.[19] *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307, 1313 (M.D.Ala. 1999); *see Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir.2001); *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 514 (6th Cir.

2000). Defendants contend that Plaintiff cannot establish the elements of a § 3730(h) claim in the instant case.

██ Defendants argue that Plaintiff was not engaged in protected whistle-blowing activity. First, it is important to note that while § 3730(h) speaks in terms of offering protection in connection with "an action filed or to be filed," the Eleventh Circuit does not mandate that a plaintiff's conduct be incident to an actual lawsuit filed or to be filed under the False Claims Act. So long as the filing of a False Claims Act suit is a "distinct possibility" at the time of a plaintiff's conduct, Section 3730(h) will protect the plaintiff. *E.g., Childree v. UAP/GA AG Chem, Inc.*, 92 F.3d 1140, 1146 (11th Cir.1996). The *Childree* court also made it clear that § 3730(h) does not require the plaintiff to be aware of the existence of the False Claims Act claim at the time of his conduct. *Id.; see also Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C.Cir.1998). Nevertheless, there must be some nexus between the conduct of a plaintiff and the "in furtherance of" prong of a False Claims Act claim. *Hutchins*, 253 F.3d at 187 (quoted source omitted).

██ In the case at bar, Plaintiff claims the act of reporting to HUD that Gold Mech, Inc. participated in and was awarded the re-bid contracts is protected whistle-blower activity. Defendants contends that at the time of Plaintiff's alleged conduct, there was no distinct possibility of a

---

Plaintiff has failed to establish a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (holding that if a plaintiff cannot prove a constitutional infringement, he is entitled to qualified immunity).

**19.** Some courts list three elements of proof for a § 3730(h) plaintiff, adding that the defendant must have been aware of the plaintiff's protected conduct. *See, e.g., ·United*

States *ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir.1996); *Robinson v. Jewish Center Towers, Inc.*, 993 F.Supp. 1475, 1477 (M.D.Fla.1998). However, this third element of knowledge on the part of the defendant is subsumed into the element of causation for a defendant cannot retaliate or discriminate against a plaintiff because of his whistle-blowing activities if the defendant is unaware of such activity.

False Claims Act claim because Plaintiff cannot identify any false record or statement made by Augusta to have the United States government pay for a false or fraudulent claim. Moreover, Plaintiff has presented no evidence that he took steps in furtherance of reporting or prosecuting a False Claims Act claim.

Plaintiff counters that the award of the three contracts to Gold Mech, Inc. in violation of HUD regulations was tantamount to a false claim by Augusta because Augusta must certify that HUD regulations are followed when CDBG monies are paid. Plaintiff continues that his alleged attempt to prevent the release of federal funds to a project that violated federal restrictions was an attempt to stop false certifications by Augusta.

I agree with Plaintiff that the expenditure of CDBG funds on a project that is not in compliance with HUD regulations could amount to a false claim even though Augusta does not necessarily submit a false statement or record. When Augusta certifies HUD compliance and expends federal government funds, it is causing economic loss to the United States government. To put it simply, it would be fraudulent to spend HUD money on projects that are not entitled to it. The fact that Augusta could be forced to repay the money to the United States government under such circumstances of non-compliance reenforces the notion that the federal government would view such spending as fraudulent.

Even so, Plaintiff must still show "a distinct possibility" of a False Claims Act claim at the time of his conduct to warrant whistle blower protection. The Honorable Myron H. Thompson of the Middle District of Alabama has explained that the "distinct possibility" test is a difficult one to apply. *Mann*, 49 F.Supp.2d at 1313–14. He asks: "The case law resolves few questions and raises more: A distinct possibility of what?

In whose eyes? At what time? And how 'distinct,' or presumably non-attenuated, must the 'possibility' be? Probable? Foreseeable? Or something less likely?" *Id.* at 1313. He points out that a plaintiff makes it an easy case when he tells an employer that he is thinking of filing an action or of reporting fraud to the government. Where a plaintiff does not even know the False Claims Act exists, however, the determination "is much more difficult, if not completely elusive." *Id.*

Judge Thompson concluded that a case should be determined by looking at the purpose of the False Claims Act and its whistle blower protection, that is, the purpose of assuring that an employer's motivation behind any action against an employee is not retaliatory. Thus, in the absence of direct evidence of an employer's motivation, the court should ask: "Whether the employee engaged in conduct from which a factfinder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud." *Id.* at 1314. If the evidence does not support such a fear, there can be no distinct possibility of litigation. *Id.*

In this case, Plaintiff reported to his employer and to HUD that he thought the re-bid process was problematic because of Gold Mech, Inc.'s involvement. In many cases, however, reports of non-compliance made in connection with a plaintiff's employment duties have not warranted whistle blower protection. *See Hopper*, 91 F.3d at 1269 (concluding that merely attempting to get an employer to comply with federal and state regulations, and not trying to recover money for the government, is not a whistle-blowing activity); *Yesudian*, 153 F.3d at 740 (differentiating between plaintiffs who merely urge compliance with regulations with those that in-

vestigate fraud outside the scope of their employment); *Eberhardt v. Integrated Design & Const., Inc.,* 167 F.3d 861, 868 (4th Cir.1999) (holding that merely investigating an employer's non-compliance with federal or state regulations is insufficient to constitute protected activity under the False Claims Act). *But see Mikes v. Strauss,* 889 F.Supp. 746, 753 (S.D.N.Y. 1995) (finding that plaintiff's observation and investigation outside the scope of employment coupled with confronting employer with evidence of mischarging Medicare patients is sufficient to establish False Claims Act claim). Indeed, why would an employer fear that an employee reporting non-compliance, whose job responsibilities include ensuring regulatory compliance, seeks to file a False Claims Act suit or report fraud to the government?

In the instant case, it is undisputed that Plaintiff was responsible for efficiently managing the Department and ensuring that project funding complied with the applicable regulations. (Defs.' St. of Undisputed Mat. Facts, ¶ 2.) Accordingly, raising concerns about HUD compliance during the re-bid process is part of Plaintiff's job. Contacting HUD to seek an opinion about the situation or even to report the situation is part of Plaintiff's job. The record of the case reveals nothing in Plaintiff's communications with HUD or with Jim Wall that would indicate that Plaintiff intended to step out of his job responsibilities to report fraud upon the government. Indeed, officials from HUD averred that Plaintiff never reported that CDBG funds were being paid to Gold Mech, Inc. on the three re-bid contracts and never reported any alleged fraudulent claim for payment submitted by Augusta. (Aff. of Stella Taylor, Aug. 3, 2004, ¶ 9; Aff. of Tony L. Simmons, Aug. 3, 2004, ¶ 9.) In the only two e-mails sent from Plaintiff to Jim Wall and George Kolb, Plaintiff requested to meet with Jim Wall and asked if he agreed with Kemp's as-

sessment that Gold Mech, Inc. was improperly awarded the re-bid contracts. (Sams Dep., Ex. 4 & Mack Aff., Ex. M, respectively.) The evidence shows nothing more than Plaintiff trying to ensure compliance before HUD funds were expended. This was his job. Accordingly, because Plaintiff cannot show a distinct possibility of a False Claims Act claim when he inquired, reported or complained about non-compliance with HUD regulations, no reasonable factfinder could conclude that he was engaged in protected conduct.

■ Moreover, even assuming Plaintiff had engaged in protected conduct, he cannot show that his termination was retaliatory. More particularly, Plaintiff cannot show that the Augusta Commission was aware that he was investigating or acting in furtherance of a report of fraud. As discussed in the previous section, the Commission had the ultimate authority to terminate Plaintiff. The record shows that the Commission acted upon Kolb's recommendation after he revealed that he had lost confidence in Plaintiff's ability to lead his Department effectively. Thus, there is no direct evidence of retaliatory intent. Plaintiff would have this Court infer that the Commission knew about his reporting activity because Kolb learned of Plaintiff's contact with HUD through Plaintiff's e-mail to Jim Wall; yet, as stated, the evidence shows that the only thing Kolb communicated to the Commission was the fact that he had lost confidence in him. Kolb's knowledge cannot be imputed to the Commission without more. In short, Plaintiff alleges no facts showing that the Commission had notice that he intended to further a False Claims Act claim in any way. Thus, the Commission could not have terminated Plaintiff because of his alleged protected conduct.

For these reasons, Defendants are entitled to summary judgment on Plaintiff's

whistle blower claim under the False Claims Act.

### D. *Plaintiff's State Law Claim*

Plaintiff asserts a breach of contract claim involving Defendants' alleged promise to credit prior service years with an unaffiliated organization (CSRA Regional Development Center) toward Plaintiff's retirement benefits. At oral argument on March 10, 2005, counsel for Defendants was asked to submit information regarding whether and to what extent other Augusta employees received retirement credit for prior employment similar to the claim of Plaintiff in this case. The parties filed a response through which they stipulate that they are unaware of any employee of the CSRA Regional Development Center subsequently becoming employed with Augusta. Defendants further assert that they would have to review the individual file of every former and current Augusta employee to determine if anyone was so employed. Accordingly, the parties submit a joint request to relieve Defendants of the burden of reviewing the personnel files in this manner.

 When no federal question claims are left in a case like this, prudential considerations prompt the Court to *sua sponte* question the propriety of retaining jurisdiction over a remaining state law claim. *See Mergens v. Dreyfoos,* 166 F.3d 1114, 1119 (11th Cir.1999) (stating that a district court may dismiss state law claims after dismissing federal claims; "[m]ore specifically ... if the federal claims are dismissed prior to trial, [*United Mine*

*Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ] *strongly encourages or even requires* dismissal of state claims" (quotes and cite omitted) (emphasis added)).

Jurisdiction over Plaintiff's state law claim rested solely upon 28 U.S.C. § 1367. Absent Plaintiff's showing that he retains viable federal claims against Defendants, the absence of a federal claim places supplemental jurisdiction in doubt. 28 U.S.C. § 1367(c)(3). Moreover, "[b]ecause 28 U.S.C. § 1367(d) tolls any applicable state statute of limitations, there is no unfairness to Plaintiff resulting from dismissal." *Smith ex rel. Lanham v. Greene County School Dist.,* 100 F.Supp.2d 1354, 1368 (M.D.Ga.2000); *see also United States Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 1005 (11th Cir.1993); *Linder v. Richmond County, Ga.,* 844 F.Supp. 764, 769 (S.D.Ga.1994). Accordingly, I will dismiss Plaintiff's state law claim. This dismissal **MOOTS** the motion to release (doc. no. 56).

### IV. CONCLUSION

Upon the foregoing, Defendants' Motion for Summary Judgment (doc. no. 22) is **GRANTED.** Plaintiff's state law claim for breach of contract is **DISMISSED WITHOUT PREJUDICE.** 28 U.S.C. § 1367(c)(3). The Clerk is instructed to **ENTER FINAL JUDGMENT** in favor of Defendants. Costs are taxed against Plaintiff.